UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**SIGNED-AFFIDAVIT paragraphs #1-40**;
**AMENDED COMPLAINT (**full filing fee included; and paid in person)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **3:23 cv 05836-LJC**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus)"* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Dckt. #3

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**SIGNED AFFIDAVIT; PARAGRAPHS 1-40**

2.      See e.g. abaforlawstudents.com/2021/11/04/evolution-of-the-bar-exam/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+BeforetheBar+%28Before+the+Bar+Blog%29#:~:text=In%201855%2C%20Massachusetts%20became%20the,exam%2C%20consisting%20of%20only%20essays. (In 1855, Massachusetts became the first state to administer a written bar exam, …. The American legal profession grew in conjunction with the United States' emerging political, social, and economic systems…..Following the establishment of the first bar examinations, law schools began to emerge in the 1870s and the process of becoming a lawyer changed.). See also; www.loc.gov/exhibits/lincoln/young-lincoln.html#:~:text=Born%20in%20a%20Kentucky%20log,to%20supplement%20his%20family's%20income. ( young Abraham Lincoln grew up in abject poverty. He had about eighteen months of formal education because he worked to supplement his family's income. An avid reader, he made extraordinary efforts to gain knowledge while working at many jobs, from farm hand to store clerk.)

5.      See e.g. Department of Fair Employment & Hous. v. Law School Admission Council, Inc., 941 F. Supp. 2d 1159, 1168 (N.D. Cal. 2013) :

> ("the LSAT as playing a "crucial role" in "determining applicants' admission to law school (and by extension, to the legal profession….filed suit to halt the ongoing harm to persons … who seek to enter the legal profession….See also Cal. Civ.Code § 51(b) ("All persons within the jurisdiction of this state are free and equal, and no matter what their … [protected characteristics] … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever"…DFEH acts as a public prosecutor testing a public right. The interest of DFEH in the law school admissions process was articulately summarized by the United States Supreme Court: In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals . . . . All members of our heterogeneous society must have confidence in the openness and integrity of

the educational institutions that provide this training. As we have recognized, law schools "cannot be effective in isolation from the individuals and institutions with which the law interacts." **Access to** legal education (and thus the legal **profession) must be inclusive of [all] talented and qualified individuals** . . . so that all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America......The State of California also has **an interest in eliminating bias and enhancing diversity** in the legal profession, and in furtherance of this interest, the testing process for entry into law school should not be an obstacle to the full and equal participation of individuals with [protected characteristics] in the legal profession. Ensuring that law school admissions reflect the diversity of our society not only affects students with [protected characteristics], but also their would-be classmates who benefit from the presence of those perspectives in the classroom, The legal **profession as a whole, and the society which it serves, stands to be negatively affected by practices that result in [their] unfair exclusion**")

7.    Georgetown, and the US Department of Education *admits, and knows,*

Georgetown is covered by Title VI, Equal Protection, as a recipient of Federal funds.

See e.g.:

https://www2.ed.gov/about/offices/list/ocr/docs/hq43e4.html (EDUCATION AND TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 - Title VI and Race, Color and National Origin Discrimination

Title VI of the Civil Rights Act of 1964 protects people from discrimination based on race, color or national origin in programs or activities that receive Federal financial assistance. Title VI states that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
Programs and activities that receive Federal financial assistance from the United States Department of Education (ED) are covered by Title VI. ED maintains an Office for Civil Rights, with 10 regional offices and a headquarters office in Washington, D.C., to enforce Title VI.

Education Programs and Activities Covered by Title VI

Agencies and institutions that receive ED funds covered by Title VI include: 50 state education agencies, their subrecipients, and vocational rehabilitation agencies; the education and vocational rehabilitation agencies of the District of Columbia and of the territories and possessions of the United States; 17,000 local education systems; 4,700 colleges and universities; 10,000 proprietary institutions; and other institutions, such as libraries and museums that receive ED funds.

Programs and activities that receive ED funds must operate in a non-discriminatory manner. These may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, housing and employment, if it affects those who are intended to benefit from the Federal funds. Also, a recipient may not retaliate against any person because he or she opposed an unlawful educational practice or policy, or made charges, testified or participated in any complaint action under Title VI. For a recipient to retaliate in any way is considered a violation of Title VI. The ED Title VI regulations (Volume 34, Code of Federal Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.)

**Georgetown's Admissions of Fact as of November 2023**

10.     See e.g. Dent v. Nat'l Football League, 902 F.3d 1109, 1117-18 (9th Cir. 2018)

("under California law, … a statute may establish the standard of care. Therefore,

the defendant's violation of a statute can give rise to a presumption that it failed to

exercise due care if it "violated a statute, ordinance, or regulation of a public

entity,".")  See also e.g. Lugtu v. California Highway Patrol, 26 Cal.4th 703, 719 n.9

(Cal. 2001) ("The Restatement Second of Torts summarizes the prevailing view in

these terms: `Where a statute, ordinance or regulation is found to define a standard

of conduct for purposes of negligence actions, . . . the standard defined is normally a

minimum standard, applicable to the ordinary situations contemplated by the

legislation. This legislative or administrative minimum does not prevent a finding

that a reasonable [person] would have taken additional precautions where the

situation is such as to call for them.' [Citations.]" (See also 6 Witkin, Summary of

Cal. Law (9th ed. 1988) Torts, § 756, p. 96, and cases cited.)"). See also e.g. Bachtel

v. Mammoth Bulk Carriers, LTD, 605 F.2d 438, 443 (9th Cir. 1979) (" "Negligence is

the failure to exercise ordinary care. It is … the failure to do something which a

reasonably careful person would have done under the same or similar

circumstances. "Ordinary care is the care a reasonably prudent person would

exercise under the same or similar circumstances."")

12.     Georgetown admits, and knows, *publicly,* that a written authorization form to

agree to commercial or business use of a photo is a contract, or contractual

agreement (*between the person whose picture is being taken and the person or*

*organization who is taking the picture for commercial or business purposes*).

Georgetown also requires *prior* approval of this contract by Georgetown's Office of

the General Counsel, and then requires signed written authorization, a contract

between student and organization, *prior* to commercial or business use or it violates

their privacy, publicity, and right to contract under 42 USC 1981 (when done in a

facially discriminatory manner; i.e. one policy for Black male students, and one for

similarly situated non-Black male students).

- https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")
- https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed.... '**The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
  - unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
  - appropriation of another's name or likeness; or
  - unreasonable publicity given to another's private life; or
  - publicity that unreasonably places another in a false light before the public.
- (See Restatement (Second) of Torts § 652 for more information.)
- **Example**: An advertiser wants to use a photograph of a woman for a billboard supporting a [campaign; advertisement]. The advertiser negotiates a license to use the photo with the photographer, who holds the copyright. If the photographer doesn't have a release from the woman in the photo (permitting the photographer to license all uses of the photo, or otherwise waiving her rights), then the advertiser must get permission from the woman before using her photo on the billboard.
- **If there was no release, the woman has kept both privacy and publicity rights** in the use of her likeness. And, depending on how she feels about the ... cause for which her image is used ... she could claim she was portrayed in a false light, as well claiming unlawful commercial appropriation of her likeness....

- **The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).
- To avoid violating someone's right of publicity you must be careful about using their:
    - image (photos, videos, film);
    - likeness (drawings, paintings, prints, etc.);
    - name (this includes nicknames and former names);
    - voice; or
    - signature.
- Make sure you have permission before using a person's image or likeness, or their voice or signature, in connection with advertising for products or services; product packaging; or on any merchandise that you sell.
- **Example**: A company films an instructional video of a man installing an acrylic bathtub liner and distributes the video to its customers. (The man agreed to be filmed for the video.) The company then hires a production company to make a TV commercial for them. The production company uses footage of the man in the commercial. He did not consent to that use of his image. The man sues both companies for unlawful appropriation and, depending on the state law applied, damages could be based on the infringers' profits and/or emotional distress.")

18.     Georgetown admits, *publicly,* that *a material* part of their advertising *to induce* contract formation with incoming students is their commitment to follow the law, their specifically outlined *publicly stated* policies, and their consummated contracts with individual admitted students.

- https://www.law.georgetown.edu/your-life-career/diversity-inclusion/ (At Georgetown Law, we strive to live by the Jesuit concept of cura personalis – the care of the *whole* person.)
- https://ideaa.georgetown.edu/notice-of-non-discrimination/
- https://www.georgetown.edu/privacy-policy/
- 
- https://www.law.georgetown.edu/wp-content/uploads/2018/02/Self-Guided-Tour-2018_Accessible-1.pdf ("Georgetown Law's location in the heart of the Washington, D.C., just blocks from the U.S. Congress and Supreme Court, allows students an unparalleled look at the dynamic legal processes of our nation. With over 100 full-time faculty, Georgetown has the most extensive curriculum of any law school… Our motto 'Law is but the means, justice is the end' sums up the core commitment of Georgetown Law. We believe that all students can get an excellent legal edu- cation while also learning how important it is to serve others.)
- https://studentconduct.georgetown.edu/ethos-statement/#:~:text=A%20commitment%20to%20open%20discourse,individual%2C%20communal%20and%20university%20property. (Ethos Statement; Choosing to come to Georgetown University means joining a distinctive community. As a Catholic and Jesuit University, Georgetown places special emphasis on the dignity and worth of every person and the love of truth. Membership in this community carries with it high expectations regarding the ways in which each person will act both within and beyond Healy Gates. In particular, students are expected to honor the following commitments in all their actions:

- ▪ A commitment to the highest standards of honesty and personal integrity both inside and outside the classroom.
- ▪ A commitment to treat others in a respectful manner, regardless of differences such as race, religion, nationality, ethnicity, gender, or sexual orientation.
- ▪ A commitment to open discourse and the free exchange of ideas. A commitment to exercise mutual care and responsibility in all relationships.
- ▪ A commitment to an active concern for the safety, security, and well-being of each individual and a respect for individual, communal and university property.)

19. Georgetown admits, *publicly,* through their own publications and protections of privacy, publicity, and other rights that these rights are in fact not only valuable, but essential in the modern interconnected world we live in.

○ Rothman, The Inalienable Right of Publicity, 100 Georgetown L.J. 185 (2012) (referenced by www.authorsalliance.org/2023/07/28/federal-right-of-publicity-takes-center-stage-in-senate-hearing-on-ai/ ("In fact, what is often billed as California's statutory right of publicity for the living (Cal. Civ. Code § 3344) was originally passed under the moniker "right of privacy" and was specifically adopted to extend statutory damages [*even*] to plaintiffs who did not have [documented] external commercial value making damage recovery challenging. (See Jennifer E. Rothman, The Right of Publicity: Privacy Reimagined for a Public World (Harvard Univ. Press 2018)).")

○ https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=2462&context=facpub ("different states approach it somewhat differently. New York, for example, has only a statutory right, and it is expressly limited to uses of a person's name, picture, portrait or voice for advertising or purposes of trade; the courts have interpreted its scope narrowly.17 … many other states—including litigation and entertainment powerhouse California18—are not so limited, and define the right of publicity to include for-profit speech by artists if the speech "exploits" a person's identity.19"

  12 Id. at 39 (citing Michael Madow, Private Ownership of Public Image: Popular Culture and Publicity Rights, 81 CALIF. L. REV. 125, 157–58 (1993)).
  13 Id. at 40 (citing Robert E. Mensel, Kodakers Lying in Wait: Amateur Photography and the Right of Privacy in New York, 1885-1915, 43 AM. Q. 24, 32 (1991)).
  ….

17 See N.Y. CIV. RIGHTS LAW § 51 (McKinney 2014) (providing a cause of action when a person's "name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade" without the person's written consent); …

18 See Cal. Civ. Code § 3344(a) (statutory right of publicity protecting "name, voice, signature, photograph, or likeness" against uses "on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services" (emphasis added)); Stewart v. Rolling Stone LLC, 105 Cal. Rptr. 3d 98, 111 (Cal. Ct. App. 2010) (identifying the elements of the common law claim as: "(1) the defendant's use of the plaintiff;s identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury" (emphasis added and internal quotation marks omitted)).

22.     Georgetown itself admits, *publicly,* that not only must the written authorization, as a contractual agreement,  be signed by the student *prior* to use, but that the form itself 'must' include certain information, (*including acknowledgement of 'consideration' per contract law; see below*) to be valid, and enforceable (and even includes an example photographic/ videographic release form for students in their continuing education programs; Georgetown's neighbor George Washington University publicly provides a comparative example for its own students ). See e.g

https://static.scs.georgetown.edu/upload/kb_file/2015_release_form.pdf

"For good and valuable Consideration herein acknowledged as received, and by signing this release, I hereby give the Photographers/Filmmakers and Assigns my permission to use the Recording, and to license the Recording for use by others, in any media (including digital, electronic, print, television, film and other media now known or to be invented) in perpetuity for all commercial and non-commercial purposes. I agree that the Recording may be combined with other images, text and graphics, and cropped, altered or modified. I agree that I have no rights in or to the Recording, and all rights to the Recording belong to the Photographer/Filmmaker and Assigns. I acknowledge and agree that I have no further right to additional consideration or accounting, and that I will make no further claim for any reason to Photographer/Filmmaker and/or Assigns. I hereby release Georgetown University, and its assignees and designees, from any and all claims and demands arising out of or in connection with the use of the Recording, including but not limited to any claims for copyright infringement, defamation, invasion of privacy, or right of publicity. I acknowledge and agree that this release is binding upon my heirs and assigns. I agree that this release is irrevocable, worldwide and perpetual.

Releasor Information Name (print) _____

(print name)

Address _____

City _____ State _____ Zip Code _____

Country _____ Phone _____

Email _____ Date of Birth _____

Signature _____ Date _____ "

https://communications.gwu.edu/photo-video-release

**Photo & Video Recording Release**

This release and authorization agreement ("Agreement") shall confirm that I, (insert full name in form below), (hereafter "I" or "Student"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, grant permission to the George Washington University ("GW" or "University") and its licensees, assignees, and other successors-in-interest all rights whatsoever in perpetuity in and to my performance, appearance, voice, and other reproductions of my likeness, name, and/or material ("Appearance") taken in conjunction with (insert name of event or photo/video project below), and to use the same or portions thereof, including making and using derivative works thereof in any medium, including without limitation, videos, online broadcasts and brochures (collectively the "Works"), for any university purpose.

I further grant to GW all rights of every kind and nature in and the results and proceeds of my Appearance. I acknowledge that GW shall be the sole and exclusive owner of all rights in and to the Works, including, without limitation, the copyright therein and all of the results and proceeds of my Appearance hereunder and shall have the right to exploit any or all of the foregoing in any manner and in any media, whether now known or hereafter devised in perpetuity…..I agree that GW shall have sole editing discretion in determining the extent and manner of use of my Appearance. Nothing herein will be deemed to obligate GW to use my Appearance or the results and proceeds thereof, in the Work or otherwise, or to produce, release or distribute the Works, or to otherwise exploit any rights granted to GW hereunder. GW shall have the right to assign this Agreement (or any of its rights hereunder) to any person, firm, partnership or corporation for any reason and without notice to Student.

I hereby voluntarily assume any and all risks, known or unknown, associated with my Appearance. I and my heirs, executors, administrators and assigns, hereby voluntarily release, discharge, waive and relinquish any and all claims, complaints, liabilities, actions and causes of actions ("Claims") against GW. I agree to defend, indemnify (including any and all attorney's fees) and hold harmless GW in the event of any and all Claims, by whomever or wherever asserted……I have read, understand and agree to the above terms and conditions. I warrant that I have the right and power to enter into and fully perform this Agreement and to grant GW the rights herein granted. I am over the age of 18 years of age, or I have the approval of my parent or legal guardian if I am under the age of 18. I understand that this contains the entire understanding of the parties relating to the subject matter and cannot be changed or terminated without the written consent of both parties. The provisions shall be binding upon me and my heirs, executors, administrators and successors. All rights, licenses and privileges herein granted are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

Name
Event Name or Photo/Video Project Title
Date
Date: Date
mm/dd/yyyy
Student Address
Email Address
Signature

24.     Georgetown knows Mr. Austin Identifies as Black or African American, and

takes pride, and joy, in his heritage.  See e.g. Students for Fair Admissions, Inc. v.

President & Fellows of Harvard Coll., No. 20-1199, 104 (U.S. Jun. 29, 2023) ("In

fact, [truly] meritocratic systems have long refuted bigoted misperceptions of what

[B]lack students [men, and people] can accomplish.")  See also e.g. The

Mis-Education of the Negro. By Carter Godwin Woodson. (Washington: The

Associated Publishers, Inc., 1933 ("You might study the history as it was offered in

our system from the elementary school throughout the university, and you would

never hear Africa mentioned except in the negative. You would never thereby learn

that Africans first domesticated the sheep, goat, and cow, *developed the idea of trial*

*by jury*, produced the first stringed instruments, and gave the world its greatest

boon in the discovery of iron. You would never know that prior to the Mohammedan

invasion about 1000 A.D. these natives in the heart of Africa had developed

powerful kingdoms which were later organized as the Songhay Empire

www.britannica.com/place/Songhai-empire; www.worldhistory.org/Songhai_Empire/

; www.worldhistory.org/Mali_Empire/ ; www.worldhistory.org/Mansa_Musa_I/ ;

www.history.co.uk/articles/ mansa-musa-the-richest-person-in-history  on the order

of that of the Romans and boasting of similar grandeur.") Compare Ex Parte

Milligan, 71 U.S. 2, 78 (1866)

("Every citizen may safely pursue his lawful calling in the open day; and at night, … he may lie down in security, and sleep the sound sleep of a freeman. They are in force, and they will remain in force. We have not surrendered them, and we never will.

But how am I to prove the existence of these rights?

I do not propose to do it by a long chain of legal argumentation, nor by the production of numerous books with the leaves turned down and the pages marked. If it depended upon judicial precedents, I think I could produce as many as might be necessary. If I claimed this freedom, under any kind of prescription, I could prove a good long possession in ourselves and those under whom we claim it.

I might begin with Tacitus, and show how the contest arose in the forests of Germany more than two thousand years ago; how the rough virtues and sound common sense of that people established the right of trial by jury, and thus

started on a career which has made their posterity the foremost race that ever lived in all the tide of time. The Saxons carried it to England, and were ever ready to defend it with their blood.

It was crushed out by the Danish invasion; and all that they suffered of tyranny and oppression, during the period of their subjugation, resulted from the want of trial by jury.

If that had been conceded to them, the reaction would not have taken place which drove back the Danes to their frozen homes in the North. But those ruffian seakings could not understand that, and the reaction came. Alfred, the greatest of revolutionary heroes and the wisest monarch that ever sat on a throne, made the first use of his power, after the Saxons restored it, to re-establish their ancient laws. He had promised them that he would, and he was true to them because they had been true to him. But it was not easily done; the courts were opposed to it, for it limited their power — a kind of power that everybody covets — the power to punish without regard to law. He was obliged to hang forty-four judges in one year for refusing to give his subjects a trial by jury.

When the historian says that he hung them, it is not meant that he put them to death without a trial. He had them impeached before the grand council of the nation, the Wittenagemote, the Parliament of that time. During the subsequent period of Saxon domination, no man on English soil was powerful enough to refuse a legal trial to the meanest peasant.

If any minister or any king, in war or in peace, had dared to punish a freeman by a tribunal of his own appointment, he would have roused the wrath of the whole population; all orders of society would have resisted it; lord and vassal, knight and squire, priest and penitent, bocman and socman, master and thrall, copyholder and villein, would have risen in one mass and burnt the offender to death in his castle, or followed him in his flight and torn him to atoms. It was again trampled down by the Norman conquerors; but the evils resulting from the want of it united all classes in the effort which compelled King John to restore it by the Great Charter. Everybody is familiar with the struggles which the English people, during many generations, made for their rights with the Plantagenets, the Tudors, and the Stuarts, and which ended finally in the Revolution of 1688, when the liberties of England were placed upon an impregnable basis by the Bill of Rights.

Many times the attempt was made to stretch the royal authority far enough to justify military trials; but it never had more than temporary success. Five hundred years ago Edward II closed up a great rebellion by taking the life of its leader, the Earl of Lancaster, after trying him before a military court. Eight years later that same king, together with his lords and commons in Parliament assembled, acknowledged with shame and sorrow that the execution of Lancaster was a mere murder, because the courts were open, and he might have had a legal trial. Queen Elizabeth, for sundry reasons affecting the safety of the state, ordered that certain offenders out of her army should be tried according to the law martial. But she heard the storm of popular vengeance rising, and, haughty, imperious, self-willed as she was, she yielded the point; for she knew that upon that subject the English people would never consent to be trifled with. Strafford, as Lord Lieutenant of Ireland, tried the Viscount Stormont before a military commission, and executed him. When impeached, he pleaded in vain that Ireland was in a state of insurrection, that Stormont was a traitor, and the army would be undone if it could not defend itself without appealing to the civil courts.

The Parliament was deaf; the king himself could not save him; he was condemned to suffer death as a traitor and a murderer. Charles I issued commissions to divers officers for the trial of his enemies according to the course of military law. If rebellion ever was an excuse for such an act, he could surely have pleaded it; for there was scarcely a spot in his kingdom, from sea to sea, where the royal authority was not disputed by somebody. Yet the Parliament demanded, in their petition of right, and the king was obliged to concede, that all his commissions were illegal. James II claimed the right to suspend the operation of the penal laws — a power which the courts denied — but the experience of his predecessors taught him that he could not suspend any man's right to a trial.

He could easily have convicted the seven bishops of any offence he saw fit to charge them with, if he could have selected their judges from among the mercenary creatures to whom he had given commands in his army. But this he dared not do. He was obliged to send the bishops to a jury, and endure the mortification of seeing them acquitted. He, too, might have had rebellion for an excuse, if rebellion be an excuse. The conspiracy was already ripe which, a few months afterwards, made him an exile and an outcast; he had reason to believe that the Prince of Orange was making his preparations, on the other side of the Channel, to invade the kingdom, where thousands burned to join him; nay, he pronounced the bishops guilty of rebellion by the very act for which he arrested them. He had raised an army to meet the rebellion, and he was on Hounslow Heath reviewing the troops organized for that purpose, when

he heard the great shout of joy that went up from Westminster Hall, was echoed back from Temple Bar, spread down the city and over the Thames, and rose from every vessel on the river — the simultaneous shout of two hundred thousand men for the triumph of justice and law.....

...The courts are open, the organization of society is intact, the judges are on the bench, and their process is not impeded; but their jurisdiction is gone. Why? For no reason, if not because war exists, and the silent, legal, technical operation of that fact is to deprive all American citizens of their right to a fair trial. That class of jurists and statesmen who hold that the trial by jury is lost to the citizen during the existence of war, must carry out their doctrine theoretically and practically to its ultimate consequences. **The right of trial by jury being gone, all other rights are gone with it**......We have no apprehension that this power, under our American system of government, in which all official authority is derived from the people, and exercised under direct responsibility to the people.")

25.    they are liable under 42 USC 1981 even prior to the more expansive language

implemented by Congress beyond just "make and enforce" terminology.  See e.g.

Patterson v. McLean Credit Union, 491 U.S. 164, 165 (1989) ("The "right . . . to

make . . . contracts" extends... to the formation of a contract, such that § 1981's

prohibition encompasses the discriminatory refusal to enter into a contract with

someone, as well as the offer to make a contract only on discriminatory

terms....Thus, for example, if a potential person is offered (and accepts) a contract

… for less money than others [similarly situated], … the question under § 1981

remains whether the [organization], at the time of the formation of the contract, in

fact intentionally refused to enter into a contract with the employee on racially

neutral terms.")  See also e.g. Domino's Pizza v. McDonald, 546 U.S. 470, (2006)

("can… state a § 1981 claim [when] he has (or would have) rights under the existing

(or proposed) contract that he wishes "to make and enforce." The statute, originally

enacted as § 1 of the Civil Rights Act of 1866, now protects the equal right of "[a]ll

persons" to "make and enforce contracts" without respect to race, § 1981(a), and

defines "make and enforce contracts" to "includ[e] the *making, performance,*

*modification, and termination of contracts, and the enjoyment of all benefits . . . of*

*the contractual relationship*," § 1981(b). … The right to "make contracts" protected

by the 1866 legislation was not the insignificant right to act as an agent for someone else's contracting, but was rather the right, denied in some States to [Black people], to give and receive contractual rights on one's own behalf The statute's text makes this common meaning doubly clear by speaking of the right to "make and enforce" contracts…. Any § 1981 claim, therefore, must initially identify an impaired "contractual relationship," § 1981(b), under which the plaintiff has rights. — ignores the explicit statutory requirement that the plaintiff be the "perso[n]" whose "right . . . to make and enforce contracts," § 1981(a), was "impair[ed]," § 1981(c), on account of race. Shaare Tefila Congregation v. Cobb, 481 U. S. 615, 618; Runyon v. McCrary, 427 U. S. 160, 168; and Goodman v. Lukens Steel Co., 482 U. S. 656, 669,")

26.    this is why 42 USC 1981 had to explicitly state Black men, and people, have the "same right to contract as a White man" because racism, and discrimination built in the assumption of inferiority and presumed it could take from Black people without 'consideration,' nor 'mutual assent,' but instead by force.  See e.g. U.S. v. Nelson 277 F.3d 164 (2d Cir. 2002)(   ….The fact is that the Thirteenth Amendment was enacted in response to the enslavement of African-Americans in this country, and congressional enactments pursuant to the Amendment have been directed at the plight of African-Americans in the aftermath of that enslavement….)  See also e.g. L.J. 1609, 1639 (2001). the Supreme Court in the Civil Rights Cases interpreted the Thirteenth Amendment to authorize Congress to abolish not only chattel slavery itself but also to "pass all laws necessary and proper for abolishing all

badges and incidents of slavery," Civil Rights Cases, 109 U.S. at 20, 3 S.Ct. 18,

....the Court held that the Congress's power to abolish the "badges and incidents of

slavery" [included] "secur[ing] to all citizens of every race and color . . . those

fundamental rights which are the essence of civil freedom, namely, the *same right to*

*make and enforce contracts, to sue, be parties, give evidence,* and to inherit,

purchase, lease, sell, and convey property, as is enjoyed by [W]hite citizens." Id. at

22, 3 S.Ct. 18.)

28.     Georgetown admits, *publicly,* that a student, or  "Any applicant for

employment or admission, current or former employee or student, or third party

(hereinafter referred to as "Complainant")" can make a complaint via email or in

person, and is encouraged to do so; :

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Requirements for Filing Grievances**
> Any applicant for employment or admission, current or former employee or student, or third party (hereinafter
> referred to as "Complainant") of Georgetown University may file a discrimination or harassment complaint with
> IDEAA....
>
> A grievance must be filed in writing with IDEAA at M-36 Darnall Hall, electronically at ideaa@georgetown.edu, or
> by fax at (202) 687-7778."

29.     Georgetown admits, *publicly,* that once complaint is made via email, as Mr.

Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its

own policies or the law that informs and undergirds IDEAA

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Procedures for Processing Grievances**
>
> **Intake**
> IDEAA staff shall schedule intake meetings with Complainants and Respondents in order to provide a general
> understanding of the relevant policy and this grievance procedure, as well as University support resources, as
> appropriate. The intake meeting may also involve a discussion of any interim or supportive measures that may be
> appropriate concerning the individual's academic, University housing, and/or University employment arrangements.
> At the request of the Complainant, IDEAA staff shall proceed to Step I Informal Resolution, or the Step II
> Investigation process detailed below. Pursuant to the Policy on Sexual Misconduct, Informal Resolution will not be
> used to resolve allegations of Title IX Sexual Harassment made by a student against an employee. If the

Complainant wishes to proceed with Step I Informal Resolution or Step II Investigation, then IDEAA staff will meet with the Respondent to provide the Respondent a general understanding of the relevant policy and procedure. In the event the Respondent is a member of a collective bargaining unit, IDEAA will coordinate with Human Resources or the appropriate administrative unit to ensure that any required notices are provided to the union. Questioning of a witness or party who is a member of a collective bargaining unit will proceed in accordance with applicable law, policies, and collective bargaining agreements.

**Step I.  Informal Resolution**
Unless otherwise prohibited by University policy, IDEAA shall propose voluntary informal resolution, including mediation, to a Complainant desiring to resolve a dispute with a potential Respondent. If the Complainant agrees to informal resolution, the potential Respondent will be informed about the allegations and the informal resolution process, and offered an opportunity to participate in informal resolution. If both parties do not voluntarily agree to participate in the informal resolution process, the Complainant may proceed to Step II. In cases where Title IX Sexual Harassment is alleged by a student against an employee, IDEAA will not offer Informal Resolution to resolve the Complainant's allegations; in instances of alleged sexual harassment where both the Complainant and the Respondent request to mediate, the Complainant will not be asked to resolve his/her/their concerns directly with the Respondent.
If both parties agree to informal resolution, IDEAA's staff or a representative chosen by IDEAA will conduct the informal resolution within a prompt and reasonable time frame.If a mutually acceptable resolution is achieved through informal resolution, a written agreement between the parties will reflect the resolution and shall be signed and dated by the parties. Copies will be provided to both parties and IDEAA will monitor compliance with the terms of the agreement by both parties. The case will then be closed.
f informal resolution fails, IDEAA will inform the Complainant about the option to proceed to Step II.
All Complainants and Respondents have a right to end the informal resolution process at any time and can ask in writing for IDEAA to begin a Step II Investigation.
The process for informal resolution of Title IX Sexual Harassment matters is described in Appendix A.

**Step II. Investigation by IDEAA**
An individual or group of individuals may initiate a formal Complaint by providing IDEAA a written and signed statement and any supporting documentation detailing the allegations of discrimination, harassment or related retaliation and identifying the individuals who engaged in the alleged conduct (the Respondent(s)).
IDEAA shall provide the Respondent and the Respondent's supervisor, if applicable, a copy of the formal complaint and its supporting documents. The Respondent shall have an opportunity to submit a written response to the allegations and any supporting documents within twenty (20) days of receipt of the formal complaint and its supporting documents. The Complainant will be provided a copy of this response and given the opportunity to submit a written rebuttal to Respondent's statement within ten (10) days of receipt of the response. Respondent will be given a final opportunity to respond in writing to Complainant's written rebuttal within ten (10) days of receipt of the rebuttal. Both Complainant and Respondent may present evidence and identify witnesses who can provide information relevant to the allegations.

IDEAA shall within a prompt and reasonable time frame investigate the Complaint and shall have access to all necessary information to do so and the opportunity to interview witnesses, as well as Complainant and Respondent. Upon completion of the investigation, IDEAA shall prepare a written report. IDEAA uses the standard of preponderance of the evidence to ascertain if the University's policies have been violated. IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, and at the discretion of IDEAA, transcripts, and audio recordings.

**Step III. Notification**
When IDEAA finds that no violation of policies governing harassment or discrimination has occurred, IDEAA will provide notice of the results to the parties on the same day, which shall be within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**
When IDEAA finds that a violation of policies governing harassment or discrimination has occurred, IDEAA will:
Provide written notice of the results to the parties on the same day, to the extent consistent with the confidentiality accorded to University personnel actions, and within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**
Forward its report to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality. Direct that prompt remedial action be taken to correct the situation. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

**Step IV. Corrective Action**
If corrective actions are imposed, IDEAA shall monitor their implementation. In Title IX Sexual Harassment matters, the Title IX Coordinator will monitor implementation of corrective actions. The appropriate Executive Vice President, Chief Operating Officer or Senior Vice President shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions related to the allegations resulting in the corrective actions.

**Step V. Appeal**
Where IDEAA finds a violation of the Policy on Sexual Misconduct, IDEAA may notify the Complainant of the sanction or remedial action imposed on the Respondent where the sanction or remedial action relates to the Complainant."

30.     ; Yet, Georgetown themselves discriminated by not even taking a first step to acknowledge, let alone investigate and correct an administrators written admission of serious, illegal, school policy, and legal violations to the immediate detriment of an admitted Black male student showing discriminatory animus towards him.

https://policymanual.hr.georgetown.edu/1000-university-policies/1004-policy-statement-on-harassment/ (Harassment is a form of discrimination prohibited by law. It is the policy of Georgetown University to prohibit harassment (and discrimination) on the basis of …. color, …. gender …. race… ("Protected Categories")… Harassment may include… slurs, epithets, and stereotyping; … and …. conduct carried out through the internet, email…is especially serious when it occurs between teachers and students or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly exploits the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University …. This Policy Statement …. will be widely disseminated to members of the University community, and will be consistently enforced.)

35.     Georgetown admits, *publicly,* in subjecting Mr. Austin as a Black male student to a different privacy policy than similarly situated non-Black male admitted students, faculty, staff, and that it publicly advocated for in *GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)* when being 'forced' to disclose, not voluntarily or willfully violate (*as*

*they did to Mr. Austin*), that they in fact intended to facially discriminate against

him by treating him in an inferior manner.   www.georgetown.edu/ privacy-policy/

> "Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......**Georgetown complains** that ... requiring it to report .... **forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ....FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that ...release .. educational records"  ..... Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

37.    Georgetown *demonstrates, and admits in writing and via conduct,* that under

no circumstances should medical information or a photo be released or commercially

used (photo) without the student's written authorization agreement (contract);

Georgetown advocates this position so strongly (*despite California's CMIA, or US*

*Statute's HIPAA  all that's required is oral, or written patient request*) that they

refused to release Mr. Austin's own medical records *to himself* without signed

written authorization (*but ironically commercially used his photo without his a.*

*knowledge, b. consent, nor c. written authorization in violation of their mandatory*

*policy*).  See e.g. Bugarin v. Chartone, Inc. 135 Cal.App.4th 1558 (Cal. Ct. App.

2006)(to describe a natural person who is the subject of medical records or, in the

words of the federal regulations, who is the subject of "protected health

information." The structure of part 164 confirms this interpretation. In the interest

of giving an individual free access to his or her own medical records, the covered

entity is under an absolute obligation to furnish those records on request. (45 C.F.R.

§ 164.524(c)(1) (2005).) *Privacy concerns do not arise when the individual requests*

*his or her own records; thus, the right to the records is absolute when the individual*

*requests them*.)  See also snippet(s) from two email conversations as illustrations

highlighting the illegal irony:

"On Wednesday, July 13, 2022, Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov> wrote:
I understand what you are saying, Mr. Austin.  Thank you for the additional information.  I will let you
know if OCR needs additional information.

Regards,

Catherine Cushman

Investigator

United States Department of Health & Human Services

Office for Civil Rights, Mid-Atlantic Region
801 Market Street, Suite 9300
Philadelphia, PA 19107
Catherine.Cushman@hhs.gov

215-861-4444 (Office)

From: George Austin <gaustin07@berkeley.edu>
Sent: Wednesday, July 13, 2022 4:06 PM
To: Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>
Cc: ideaa@georgetown.edu; presidentsoffice@georgetown.edu
Subject: Re: Case No. 475893 (HHS/OCR). Additional Information as Requested

The two email contacts are cc'd here.

On Wed, Jul 13, 2022 at 12:27 PM George Austin <gaustin07@berkeley.edu> wrote:

It provides for authorization for others.  I only requested the records for myself.  All that's required is a
written or oral request.

They've already violated my privacy and publicity rights so want to be sure they know I'm not giving
authorization for anyone else.  I just want them for myself as I'm entitled.

On Wed, Jul 13, 2022 at 11:36 AM Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>
wrote:

Why didn't you use the form provided by Georgetown University Student Health Services?

From: George Austin <gaustin07@berkeley.edu>
Sent: Wednesday, July 13, 2022 2:22 PM
To: Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>
Cc: George Austin <Gaustin07@berkeley.edu>
Subject: Re: Case No. 475893 (HHS/OCR). Additional Information as Requested

Documents attached here.  Didn't sign or send authorization for anyone else, just requested for myself.

On Wed, Jul 13, 2022 at 11:17 AM Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>
wrote:

Please provide a copy of the form you faxed to Georgetown.

Thank you.

Catherine Cushman

Investigator

United States Department of Health & Human Services

Office for Civil Rights, Mid-Atlantic Region
801 Market Street, Suite 9300
Philadelphia, PA 19107
Catherine.Cushman@hhs.gov

215-861-4444 (Office)

From: George Austin <gaustin07@berkeley.edu>
Sent: Wednesday, July 13, 2022 1:31 PM
To: Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>
Cc: George Austin <Gaustin07@berkeley.edu>
Subject: Re: Case No. 475893 (HHS/OCR). Additional Information as Requested

Also, Ms. Cushman

I faxed the number provided by Georgetown for that purpose:

https://studenthealth.georgetown.edu/medical-care/forms-3/

On Tue, Jul 12, 2022 at 6:23 PM George Austin <gaustin07@berkeley.edu> wrote:

Hi Ms. Cushman,

Attached are the responses to the questions in red as well as an attached example of the inquiry.  See attached

Are there additional questions?

Thank you,

George Jarvis Austin"

—-------------------------------------------------------------------

**Request for Records**
External
Inbox

Pearson, Tashana J <Tashana.J.Pearson@medstar.net>
Attachments
Wed, Jul 27, 2022, 5:37AM
to me

Hello Mr. Austin

Please complete, sign and date the attached authorization for your medical records and return it to me at your earliest convenience.  Once received, I will forward your request for processing.

Thanks a bunch.

Tashana J. Pearson, RHIA, RHIT, CCA
Manger, Health Information Management
Medstar Medical Group
Health Information Management Department


Pearson, Tashana J <Tashana.J.Pearson@medstar.net>
Attachments
Wed, Jul 27, 2022, 7:50AM
to me

Hello Mr. Austin,


It also came to my attention that you requested a copy of records on 07/12/22 and prefer to communicate by e-mail.

At this time, we're unable to provide those records requested 07/12/22 to you as we need more information from you to proceed. Under privacy regulations, we have to verify the identity of the requestor and which records specifically are sought in part to prevent a privacy breach.

Please complete the attached authorization form and indicate which records you are looking for as well. The form does not release information to another person unless you write in the other person's name and contact information as a recipient of the information.

If you have a concern your privacy rights have been violated by MedStar Health, you may call or file a complaint in writing with the MedStar Health Privacy Office or the Department of Health and Human Services (please reference the contact information below):

Privacy Officer

MedStar Health, Inc.

PrivacyOfficer@MedStar.net

One attachment
• Scanned by Gmail

---------- Forwarded message ---------
From: Pearson, Tashana J <Tashana.J.Pearson@medstar.net>
Date: Wed, Aug 3, 2022 at 5:33AM
Subject: RE: [EXTERNAL] Re: Request for Records
To: George Austin <gaustin07@berkeley.edu>
Cc: Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>, ideaa@georgetown.edu <ideaa@georgetown.edu>, presidentsoffice@georgetown.edu <presidentsoffice@georgetown.edu>

Hi Mr. Austin,

Thank you for the message. As noted, additional identifiers are needed to establish your identity.

Unfortunately, we do regularly receive e-mails or calls from individuals who pretend to be another person and try to obtain their records. For many reasons including but not limited to preventing a privacy breach, avoiding identity theft, and understanding which specific types of records an individual such as yourself is looking for, the form helps meet requirements under HIPAA and other privacy laws and regulations.

The form includes fields such as a DOB which would help establish identity. The form also has you fill out other areas that we need information on, such as which specific records you're looking for, dates, and how you would want to receive the records, among other areas.

Upon review, I did not find the above berkley.edu e-mail in our records systems for a patient with your name.

Thanks.

Tashana J. Pearson, RHIA, RHIT, CCA
Manger, Health Information Management

From: George Austin <gaustin07@berkeley.edu>
Sent: Friday, July 29, 2022 8:10 PM
To: Pearson, Tashana J <Tashana.J.Pearson@medstar.net>
Cc: Cushman, Catherine (HHS/OCR) <Catherine.Cushman@hhs.gov>; ideaa@georgetown.edu; presidentsoffice@georgetown.edu
Subject: [EXTERNAL] Re: Request for Records

Good morning, Ms. Pearson

Which regulation or policy requires use of the form?

HIPAA only requires written, or oral request?

Can you provide the exact policy number as Ms. Cushman cc'd here is currently investigating?

Thank you,

George Jarvis Austin


On Wed, Jul 27, 2022 at 7:55 AM George Austin <gaustin07@berkeley.edu> wrote:

Good morning, Ms. Pearson

Which regulation or policy requires use of the form?

HIPAA only requires written, or oral request?

Can you provide the exact policy number as Ms. Cushman cc'd here is currently investigating?

Thank you,

George Jarvis Austin


On Wed, Jul 27, 2022 at 7:50 AM Pearson, Tashana J <Tashana.J.Pearson@medstar.net> wrote:

Hello Mr. Austin,

It also came to my attention that you requested a copy of records on 07/12/22 and prefer to communicate by e-mail.

At this time, we're unable to provide those records requested 07/12/22 to you as we need more information from you to proceed. Under privacy regulations, we have to verify the identity of the requestor and which records specifically are sought in part to prevent a privacy breach.

Please complete the attached authorization form and indicate which records you are looking for as well. The form does not release information to another person unless you write in the other person's name and contact information as a recipient of the information.

If you have a concern your privacy rights have been violated by MedStar Health, you may call or file a complaint in writing with the MedStar Health Privacy Office or the Department of Health and Human Services (please reference the contact information below):

Privacy Officer

MedStar Health, Inc.

To illustrate the irony, and misplaced priorities, when Mr. Austin has repeatedly requested in writing, and orally (via phone), his Georgetown medical records, as an admitted student, they have refused to provide his own required information (*per California's CMIA, or US Statute's HIPAA  all that's required is oral or written request*), and mandated multiple steps of unrequired verification to get *his own medical information.*  Yet, in opposition to the legal, contractual, and policy standards Georgetown itself has enshrined, and argued, use of his close up Photo for commercial advertising purposes, that would require my authorization (*I.e. signed form, written consent, notice, etc.*), they completely ignored those legal necessities and violated his privacy, and publicity rights throughout CA forum state (and subsequently his Equal Protection, Due Process, 42 USC 1981, duties against deceit, negligence and bad faith, rights also).  Georgetown completely inverted their responsibility and refused what they are obligated to provide, and went out of their way to exploit, and violate, Mr. Austin's privacy and publicity rights that they have an admitted, publicly proclaimed, and publicly advocated, obligation to protect.  See e.g. GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003).("Georgetown complains that … requiring it to report …. forces the

University to violate the Federal Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students")

38.     Georgetown admits, *through its conduct in front of 50+ witnesses,* that it a. intended to violate Mr. Austin's right to privacy, publicity, Equal Protection, and right to contract under 42 USC 1981 (as well as other rights) b. intended to fraudulently omit material information, and mis-tate its commitment to the law to induce contract with Mr. Austin c. intended to do so *maliciously, knowingly, and egregiously,* as they never apologized, investigated, nor corrected, even while admitting their violations in writing and to date have never presented (before nor after commercial usage) a written authorization for Mr. Austin to sign per Georgetown's own publicly stated mandate in accordance with Federal and State laws.

---------- Forwarded message ---------
From: George Austin <gaustin07@berkeley.edu>
Date: Thu, Oct 12, 2023 at 10:27 PM
Subject: No Written Authorization Form, Demonstrated Malice, No Consent(written, nor otherwise)+ Missing, Deprived, and Required Steps Per Manual-Policy-Law: (Repeated Anti-Black Racial Animus, displayed) 50+ documented Formal Complaint(s) : Race & Gender (Black Man) Formal IDEAA, Equal Protection, Disparate Treatment Complaint(s) (and public notice to other Leadership). Re: 9.11.23 (10.13.23) - List of Previously, and Still, Unanswered Questions Re: Misstatements and Omissions
To: Adam Adler <Adam.Adler@georgetown.edu>, Elizabeth Decherd <elizabeth.decherd@georgetown.edu>, GeneralCounsel@georgetown.edu <GeneralCounsel@georgetown.edu>, Georgetown Law Admissions <lawadmis@georgetown.edu>, Kelly Blevins <kcb27@georgetown.edu>, LawHousing@georgetown.edu <LawHousing@georgetown.edu>, OCR <ocr@ed.gov>, finfront@georgetown.edu <finfront@georgetown.edu>, hotline@law.georgetown.edu <hotline@law.georgetown.edu>, ideaa@georgetown.edu <ideaa@georgetown.edu>, lawfinaid@georgetown.edu <lawfinaid@georgetown.edu>, lc1275@law.georgetown.edu <lc1275@law.georgetown.edu>, mcb48@law.georgetown.edu <mcb48@law.georgetown.edu>, <media@georgetown.edu>, <privacy@georgetown.edu>, <visualidentity@georgetown.edu>
CC: Olabisi.Okubadejo@georgetown.edu <Olabisi.Okubadejo@georgetown.edu>, alw77@georgetown.edu <alw77@georgetown.edu>, emb257@georgetown.edu <emb257@georgetown.edu>, kilkennr@georgetown.edu <kilkennr@georgetown.edu>, lawdeanofstudents@georgetown.edu <lawdeanofstudents@georgetown.edu>, presidentsoffice@georgetown.edu <presidentsoffice@georgetown.edu>, vicepresident@georgetown.edu <vicepresident@georgetown.edu>

Good evening, and Happy early Friday the 13th (10.13.23), Georgetown Visual Identity, Media, and Privacy Centers, Lisa Curtis, Mitch Bailin, and Georgetown University (including IDEAA, General Counsel, and President's Office cc'd here)

Why was no Georgetown written authorization form presented to me for signature, as a Black male admitted student (as exemplified below), prior to or after photo used for business or commercial purpose; why was there no notice of photo being taken, nor notice of use for commercial purpose, nor any apology nor corrective action for violating a multitude of my rights once Mitch Bailin acknowledged use (after the fact; see below Georgetown letter)?

See e.g. https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first   have obtained that person's express consent. If the person is a Georgetown student, you must use a written consent form that has been approved in advance by the Office of the General Counsel.")

   See e.g. https://static.scs.georgetown.edu/upload/kb_file/2015_release_form.pdf
"For good and valuable Consideration herein acknowledged as received, and by signing this release, I hereby give the Photographers/Filmmakers and Assigns my permission to use the Recording, and to license the Recording for use by others, in any media (including digital, electronic, print, television, film and other media now known or to be invented) in perpetuity for all commercial and non-commercial purposes. I agree that the Recording may be combined with other images, text and graphics, and cropped, altered or modified. I agree that I have no rights in or to the Recording, and all rights to the Recording belong to the Photographer/Filmmaker and Assigns. I acknowledge and agree that I have no further right to additional consideration or accounting, and that I will make no further claim for any reason to Photographer/Filmmaker and/or Assigns. I hereby release Georgetown University, and its assignees and designees, from any and all claims and demands arising out of or in connection with the use of the Recording, including but not limited to any claims for copyright infringement, defamation, invasion of privacy, or right of publicity. I acknowledge and agree that this release is binding upon my heirs and assigns. I agree that this release is irrevocable, worldwide and perpetual.

Releasor Information Name (print) _____
(print name)
Address _____
City _____ State _____ Zip Code _____
Country _____ Phone _____
Email _____ Date of Birth _____
Signature _____ Date _____ "
See e.g. https://communications.gwu.edu/photo-video-release
Photo & Video Recording Release
This release and authorization agreement ("Agreement") shall confirm that I, (insert full name in form below), (hereafter "I" or "Student"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, grant permission to the George Washington University ("GW" or "University") and its licensees, assignees, and other successors-in-interest all rights whatsoever in perpetuity in and to my performance, appearance, voice, and other reproductions of my likeness, name, and/or material ("Appearance") taken in conjunction with (insert name of event or photo/video project below), and to use the same or portions thereof, including making and using derivative works thereof in any medium, including without limitation, videos, online broadcasts and brochures (collectively the "Works"), for any university purpose.

I further grant to GW all rights of every kind and nature in and the results and proceeds of my Appearance. I acknowledge that GW shall be the sole and exclusive owner of all rights in and to the Works, including, without limitation, the copyright therein and all of the results and proceeds of my Appearance hereunder and shall have the right to exploit any or all of the foregoing in any manner and in any media, whether now known or hereafter devised in perpetuity.....I agree that GW shall have sole editing discretion in determining the extent and manner of use of my Appearance. Nothing herein will be deemed to obligate GW to use my Appearance or the results and proceeds thereof, in the Work or otherwise, or to produce, release or distribute the Works, or to otherwise exploit any rights granted to GW hereunder. GW shall have the right to assign this Agreement (or any of its rights hereunder) to any person, firm, partnership or corporation for any reason and without notice to Student.

I hereby voluntarily assume any and all risks, known or unknown, associated with my Appearance. I and my heirs, executors, administrators and assigns, hereby voluntarily release, discharge, waive and relinquish any and all

claims, complaints, liabilities, actions and causes of actions ("Claims") against GW. I agree to defend, indemnify (including any and all attorney's fees) and hold harmless GW in the event of any and all Claims, by whomever or wherever asserted……I have read, understand and agree to the above terms and conditions. I warrant that I have the right and power to enter into and fully perform this Agreement and to grant GW the rights herein granted. I am over the age of 18 years of age, or I have the approval of my parent or legal guardian if I am under the age of 18. I understand that this contains the entire understanding of the parties relating to the subject matter and cannot be changed or terminated without the written consent of both parties. The provisions shall be binding upon me and my heirs, executors, administrators and successors. All rights, licenses and privileges herein granted are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

Name
Event Name or Photo/Video Project Title
Date
Date: Date
mm/dd/yyyy
Student Address
Email Address
Signature

Why did Georgetown violate its own mandatory written authorization agreement (contract - see above examples) policy for all students, and single out a Black male student, and subject him to a different policy to his immediate detriment violating his 42 USC 1981 right to contract, privacy, publicity and other rights?

Are you aware that because you violated my right to contract under 42 USC 1981 by expressly violating your written authorization (agreement) contract [you are] subjecting a Black male student to inferior treatment?

Are you aware the reason for expressly stating the right to contract, for Black men, in this Country, after the Civil War, in the 13th Amendment, 42 USC 1981, is precisely because of the kind of anti-Black discriminatory conduct Georgetown did here to a Black man, in violation of the US Constitution?

Is there some type of gag order Georgetown's leadership is under (why has there been no response when your ongoing owed duties require the exact opposite conduct)?

Why was Georgetown's self-described process of obtaining written consent, and provision of notice, not followed, and egregiously violated when it came to me as a Black male admitted student, treated in an inferior manner-different than non-Black male admitted students (I.e. obvious disparate treatment)?

Are you aware that each Georgetown intentional choice to further break, or violate, your own policies, contract, and the law not only demonstrates malicious intent, but magnifies your ongoing liability?

Why has there been no formal acknowledgement of privacy violations, nor correction and disclosure of material misstatements, and omissions by Georgetown (which could have initially been included in Mitch Bailin's letter below, or thereafter per follow up questions and formal complaints)?

Why is Georgetown attempting to mark, or stamp, a Black man and admitted student, with a badge of inferiority, by intentionally depriving required services, singling out him out for inferior treatment, prior to and after admitted violations of his rights, and privacy, as well as continued fraud (material omissions; misstatements, etc.) against him without correction(s)?

Why have you displayed racial animus by not following the typical process for non-Black male similarly situated complainants?

Is there a particular point person who is most competent to handle this set of complaints beyond who is included here (as IDEAA has been completely unresponsive, at all)?

I've tried various methods: phone, email, fax (as publicly listed), why no response, steps, or even acknowledgement of complaint violating my Equal Protection (as a Black man)?

If so, please provide their contact information?

Note: this accounts for, at least, my 50th+ formal complaint to IDEAA, and Georgetown Leadership.

When is an acknowledgement of complaint filed emailed, or noticed, to Complainant?

Why have no steps, at all, toward investigation taken place, nor any follow up communication?

Why has Georgetown impermissibly used race to treat me, a Black man, in an inferior manner, refusing required investigative services, at all, and through action, or discriminatory non-action when action is mandated, and attempted to mark me, a Black man with a badge of inferiority (in an ongoing manner)?

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......Georgetown complains that ... requiring it to report .... forces the University to violate the Federal Educational Rights and Privacy Act (i.e. reasonable expectation of privacy) of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ....FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that ...release .. educational records" ..... Georgetown first raised its FERPA-based objections to the reporting obligations" - GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)





Did you see the previous questions; they are still unanswered (see below)?

Are you aware of your ongoing pattern of deception, false promises, material omissions, etc. toward me (to date I still have no been provided the requisite material information)?

How many of these were made, sent and utilized in what capacity?  Where geographically?

Are you aware of Georgetown's repeated, disparate treatment of me, and my over 30+ (now 50+) formal complaints?

Are you aware as an admitted student, and "Complainant" I am guaranteed a "prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation (I.e. disparate treatment)" per your contract, policy, and the law, was so when I first made a formal complaint, after Mitch Bailin initially admitted Georgetown's violations in writing?

1. Why did Georgetown not ask my permission before using my up close photo for advertising purposes?

2. Why did Georgetown not get my written consent, nor use of form (as reasonable expectation of privacy standards are similar for medical and student records) for use or release of an up close photo of me, an admitted student, for advertising or marketing purposes?

3. Why was it materially omitted that the photo was taken, was made public, and was used without my consent, to the person and admitted student whose rights were being exploited?

4. Why when I first asked Georgetown leadership, (after someone outside of the school was the first to tell me my photo was being used for that purpose) was the photo authentic, and actually being used for advertising, was it affirmatively denied, and I was lied to?

5. Why when several months later, after Mitch Bailin finally admitting that they in fact took the photo and used the photo for that purpose, did they refuse to tell how many physical brochures were sent or used in California, and elsewhere for that matter?

6. Why was that material information repeatedly omitted by Mitch Bailin and Georgetown University Leadership, and continues to be omitted to date, despite my repeated inquiries?

7. I have placed at least [50+] formal and informal complaints related to this specific set of topics with IDEAA and Georgetown Leadership ; why has no investigation, nor even follow up inquiry by those tasked to investigate these types of issues or taken even a cursory first step toward investigation nor resolution despite me being an admitted student?

Thank you,

George Jarvis Austin

40.    Georgetown *admits its own* impermissible use of race, or derogatory racial stereotypes to harm, Mr. Austin a Black male admitted student, *through their words, and conduct*, as the June 29, 2023, 237 page Supreme Court opinion in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* repeatedly highlighted as illegal and in violation of students, or applicants Equal Protection; Georgetown repeatedly choose to presume an admitted Black male student, Black men, and Black people as *"inferior,"* and *"unworthy of consideration"* habitually refusing basic, required *publicly admitted* steps for essential policy, practices, programs and activities that non-Black male admitted students are granted providing unfair advantage to them, and stigma, over 50+ discrete adverse acts creating immediate, and ongoing, detriment to Mr. Austin (as *none of publicly listed **IDEAA steps I-V** were even attempted*, nor were Mr. Austin complaints even

acknowledged conveying, and reinforcing, *derogatory racist stereotypes of presumptive inferiority).*  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 109 (U.S. Jun. 29, 2023):

> (" [Forbids] from intentionally treating one person worse than another similarly situated person because of his race, [or derogatory racial stereotypes]" [as the behavior] stamp[s]... with a badge of inferiority." Adarand, 515 U.S., at 241 (opinion of THOMAS, J.)...."In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial group-regardless of their age, education, economic status, or the community in which they live-think [or presumptively act] alike '" (quoting Shaw v. Reno, 509 U.S. 630, 647 (1993))..."the Court's Equal Protection Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory] stereotyping"...."furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 (internal quotation marks omitted). Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S., at 631, contrary as it is to the "core purpose" of the Equal Protection Clause, Palmore, 466 U.S., at 432."..."tremendous harm inflicted [by use of derogatory racial stereotyping].... See Cooper v. Aaron, 358 U.S. 1, 16 (1958) (following Brown, "law and order are not here to be preserved by depriving the [so-called Negro; Black or African American people] of their constitutional rights").  of their constitutional rights"). As the Court's opinions in these cases make clear, ... racial stereotypes harm and demean individuals.". ......JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, ....stigma results from "racial stereotypes that have attached historically to different groups...."has a detrimental effect" on Black students [and people] by "denoting the inferiority" of "their status in the community" and by "'depriv[ing] them)

## AFFIDAVIT, SIGNATURE, AND PARAGRAPH COUNT.

All above legal references tied directly to plead facts from paragraphs 1-40 (as part of paragraphs 1-188), are true, and as I, George Jarvis Austin personally experienced, witnessed, and observed.  Further all legal references which highlight, Mr. Austin's, plead facts as relevant, decisive, persuasive and compelling have been affirmed by the United States Supreme Court, Ninth Circuit, Northern District and California Courts.


**George Jarvis Austin**

**s/ George Jarvis Austin, Self Represented, 11/22/23**