UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff    **SIGNED-AFFIDAVIT paragraphs #41-81**
(*Admitted Student* ),    **AMENDED COMPLAINT (**full filing fee
included; and paid in person)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **3:23 cv 05836-LJC**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an** *admitted* **Georgetown student, filing complaint(s) about Georgetown's** *ongoing* **1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (***and other enumerated duties***) throughout the litigation, or settlement, phases of this legal process with** *$10 - $15* **million** *minimum* **Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown** ideaa@georgetown.edu**,**  generalcounsel@georgetown.edu**,** presidentsoffice@georgetown.edu**,** media@georgetown.edu**,** privacy@georgetown.edu**,** visualidentity@georgetown.edu**,** lawdeanofstudents @georgetown.edu**, (showing** *"deliberate indifference; discriminatory animus"***)" included 50+ outside expert 'witnesses' including**  ocr@ed.gov**,** privacyTA@ed.gov**,** studentaid@ed.gov**, and** whistleblowercoordinator.oig@ed.gov**, in real time.  See Dckt. #**3

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

## SIGNED AFFIDAVIT; PARAGRAPHS-SECTIONS 41-81

44.     Additionally, Georgetown *publicly admits* that it literally deprived Mr.

Austin's right to make a contract publicaffairs.georgetown.edu/communications/

policies/policy-for-filming-at-georgetown-university/ ; Because Georgetown

authorization agreements are *mandatory* contracts of adhesion when Georgetown

uses an admitted students', or other person's, image or likeness for business or

commercial purposes per their own policy (and the law), their choice to purposefully

violate their own mandate, and preemptively deprive the making of that contract

violates 42 USC 1981 by refusing to offer a Black man, admitted student, the same

contract it is a. legally mandated to do for *all* students and b. it would offer a White,

or non-Black male, offeree (*as 1981 protects would-be contract makers in the*

*contract making process as well as those violated in the broad language of rights,*

*enjoyment of benefit, or enforcement process*).  See e.g. Comcast Corp. v. Nat'l Ass'n

of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020) ("in General Building

Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d

835 (1982), the Court explained that § 1981 was "designed to eradicate blatant

deprivations of civil rights," such as where "a private offeror refuse[d] to extend to

[an African-American], ... because he is [an African-American], the same

opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388,

102 S.Ct. 3141")

45.     Georgetown *admits, publicly,* along with US Department of Education, that

excluding Mr. Austin because he is a Black male admitted student from essential

Georgetown activities or programs violates the *essence,* Originalist purpose, and

Legislative *intent of* Title VI of the 1964 Civil Rights Act.  See e.g. General

Dynamics Land Sys. v. Cline, 540 U.S. 581, 608-11 (2004):

"There is little doubt that the motivation behind the enactment of the Civil Rights Act of 1964 was to prevent invidious discrimination against racial minorities, especially [B]lacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey) ("The goals of this bill are simple ones: To extend to Negro citizens the same rights and the same opportunities that white Americans take for granted").

President Kennedy, in announcing his Civil Rights proposal, identified several social problems, such as how a "Negro baby born in America today . . . has about one-half as much chance of completing a high school as a [W]hite baby . . . one-third as much chance of becoming a professional man, twice as much chance of becoming unemployed, . . . and the prospects of earning only half as much." Radio and Television Report to the American People on Civil Rights, Public Papers of the Presidents, John F. Kennedy, No. 237, June 11, 1963, pp. 468-469 (1964).  He gave no examples, and cited no occurrences, of discrimination against [W]hites or indicated that such discrimination motivated him (even in part) to introduce the bill. Considered by some to be the impetus for the submission of a Civil Rights bill to Congress, the 1961 Civil Rights Commission Report focused its employment section solely on discrimination against racial minorities, noting, for instance, that the "twin problems" of unemployment and a lack of skilled workers "are magnified for minority groups that are subject to discrimination." 3 U. S. Commission on Civil Rights Report 1 (1961). It also discussed and analyzed the more severe unemployment statistics of [B]lack workers compared to white workers. See id., at 1-4; see also id., at 153 (summarizing findings of the Commission, listing examples only of discrimination against [B]lacks).

The report presented no evidence of any problems (or even any incidents) of discrimination against [W]hites. The congressional debates and hearings, although filled with statements decrying discrimination against racial minorities and setting forth the disadvantages those minorities suffered, contain no references that I could find to any problem of discrimination against whites. See, e. g., 110 Cong. Rec. 7204 (1964) (statement of Sen. Clark) ("I turn now to the background of racial discrimination in the job market, which is the basis for the need for this legislation. I suggest that economics is at the heart of racial bias. The Negro has been condemned to poverty because of lack of equal job opportunities. This poverty has kept the Negro out of the mainstream of American life"); id., at 7379 (statement of Sen. Kennedy) ("Title ... is directed toward what, in my judgment, American Negroes need most to increase their health and happiness. . . . [T]o be deprived of the chance to make a decent living and of the income needed to bring up children is a family tragedy"); id., at 6547 (statement of Sen. Humphrey) ("I would like to turn now to the problem of racial discrimination in employment. At the present time Negroes and members of other minority groups do not have an equal chance to be hired, to be promoted, and to be given the most desirable assignments"); Ibid., (citing disfavorable unemployment rates of non[W]hites as compared to [W]hites); ibid. ("Discrimination in employment is not confined to any region — it is widespread in every part of the country. It is harmful to Negroes and to members of other minority groups"); id., at 6548 ("The crux of the problem is to open employment opportunities for Negroes in occupations which have been traditionally closed to them"); id., at 6562 (statement of Sen. Kuchel) ("If a Negro or a Puerto Rican or an Indian or a Japanese-American or an American of Mexican descent cannot secure a job and the opportunity to advance on that job commensurate with his skill, then his right to be served in places of public accommodation is a meaningless one. . . . And if a member of a so-called minority group believes that no matter how hard he studies, he will be confronted with a life of unskilled and menial labor, then a loss has occurred, not only for a human being, but also for our Nation"); id., at 6748 (statement of Sen. Moss)

("All of us, that is except the person who is discriminated against on the basis of race, color, or national origin. . . . He frequently knows that he is not going to school to prepare for a job. . . . He frequently knows that no matter how hard he works, how diligently he turns up day after day, how much overtime he puts in, that he will never get to be the boss of a single work crew or the foreman of a single division. And that is what the fair employment practices title is about — not the right to displace a white man or be given preference over him — but simply the right to be in the running"). I find no evidence that even a single legislator appeared concerned about whether there were incidents of discrimination against [W]hites, and I find no citation to any such incidents. In sum, there is no record evidence "that [White] workers were suffering at the expense of [racial minorities]," and in 1964, discrimination against whites in favor of racial minorities was hardly "a social problem requiring] a federal statute to place a [White] worker in parity with [racial minorities]." Ante, at 591. Thus, "talk about discrimination because of [race would] naturally [be] understood to refer to discrimination against [racial minorities]." Ibid.")

46.    Georgetown *admits*, with over 50+ witnesses, that it knew, had actual notice of discriminatory as well as policy violative conduct (*including what it itself admitted in writing*), refused to take action, and failed to correct *ongoing* violations demonstrating extreme deliberate indifference.  See e.g. Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998) (" damages remedy [available when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference.")

47.    Mr. Austin documented all of Georgetown's previous admissions (paragraphs 7-46 above) with over 50+ witnesses, providing additional *direct evidence.  Some* of the witnesses, many of whom sent confirmation and acknowledgement, of receipt include:

- Adam Adler <Adam.Adler@georgetown.edu>,
- Elizabeth Decherd <elizabeth.decherd@georgetown.edu>,
- GeneralCounsel@georgetown.edu <GeneralCounsel@georgetown.edu>,
- Georgetown Law Admissions <lawadmis@georgetown.edu>,
- Kelly Blevins <kcb27@georgetown.edu>,
- LawHousing@georgetown.edu <LawHousing@georgetown.edu>,
- finfront@georgetown.edu <finfront@georgetown.edu>,
- hotline@law.georgetown.edu <hotline@law.georgetown.edu>,
- ideaa@georgetown.edu <ideaa@georgetown.edu >,
- lawfinaid@georgetown.edu <lawfinaid@georgetown.edu>,

- lc1275@law.georgetown.edu <lc1275@law.georgetown.edu>,
- mcb48@law.georgetown.edu <mcb48@law.georgetown.edu>,
- <media@georgetown.edu >,
- <privacy@georgetown.edu >,
- <visualidentity@georgetown.edu>
- Olabisi.Okubadejo@georgetown.edu <Olabisi.Okubadejo@georgetown.edu >,
- alw77@georgetown.edu <alw77@georgetown.edu >,
- emb257@georgetown.edu <emb257@georgetown.edu >,
- kilkennr@georgetown.edu <kilkennr@georgetown.edu >,
- lawdeanofstudents@georgetown.edu <lawdeanofstudents@georgetown.edu >,
- presidentsoffice@georgetown.edu <presidentsoffice@georgetown.edu >,
- vicepresident@georgetown.edu <vicepresident@georgetown.edu>
- OCR <ocr@ed.gov >

48.     On June 8, 2023, Justice Kagan delivered the unanimous opinion for the
Supreme Court of the United States who unanimously sided with Jack Daniel's and
overturned the Ninth Circuit in a trademark infringement and dilution case
stemming from VIP Products' "Bad Spaniels," a novelty dog toy that intentionally
parodied Jack Daniel's iconic 'Tennessee whiskey' bottle and label elements.  The
decision clarifies that when a parody of another's trademark is used as a
trademark, the … use does not qualify as "noncommercial."

> "You're as smooth as 'Tennessee whiskey'
> You're as sweet as strawberry wine
> You're as warm as a glass of brandy
> And honey, I stay stoned on your love all the time
> I've looked for love in all the same old places
> Found the bottom of a bottle's always dry
> But when you poured out your heart, I didn't waste it
> 'Cause there's nothing like your love to get me high
> You're as smooth as 'Tennessee whiskey"
>
> -   **George Jones (Original); Chris Stapleton (More Recent Remake) (with 'multivariate' artist covers)**

Georgetown has already *publicly* admitted the inherent harm of their conduct in
violation of their media, privacy (publicity) and written authorization policy, but the
Supreme Court highlights a 'smooth' analogy to a person's right of publicity, as a
trademark is "any word, name, symbol, or device, or any combination thereof" used
to "identify and distinguish" one's goods or services (*reaffirming the harm in a
purely legal, outside of policy, context*).  See Jack Daniel's Props. v. VIP Prods., No.

22-148, 6 (U.S. Jun. 8, 2023) (""[A]ny word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish")  See also Cal. Civ. Code § 3344 ("(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent … shall be liable for any damages sustained by the person or persons injured as a result thereof").  See also e.g. Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1268 (D.C. 2015) (""The District of Columbia has adopted the definition set forth by the Restatement (Second) of Torts § 652C for ... the tort of misappropriation of name." Teltschik v. Williams & Jensen, PLLC, 683 F.Supp.2d 33, 55 (D.D.C.2010) ; see also Vassiliades, 492 A.2d at 592–93. "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts SSS § 652C (1977).")

49.    Also, similar to the right of publicity, trademarks perform a key function of identifying the source of a product, thus enabling businesses (or person, in context of publicity rights) to build goodwill and consumer recognition with high quality products and are an essential tool in any businesses' intellectual property arsenal. Analogous to violations of right of publicity, a Trademark infringement is the unauthorized use of a trademark.  As The Court, per Justice Kavanaugh, articulated in *TransUnion LLC v. Ramirez (quoting Spokeo, 578 U.S. at 341)* "a plaintiff searching for a "common-law analogue for their asserted injury" need not

identify "an exact duplicate." TransUnion, 141 S. Ct. at 2204. But the plaintiff's

alleged injury must still have a "close relationship" to a traditionally recognized

harm."  Mr. Austin's right of publicity (and for that matter privacy) is a close

analogue, in this case statutory (and common law), a similar harm, to Jack Daniels

*Tennessee Whiskey."* See Jack Daniel's Props. v. VIP Prods., No. 22-148, 6 (U.S. Jun.

8, 2023)

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University.….**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (***i.e. reasonable expectation of privacy***)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution **(***i.e. explaining commonly understood reasonable expectation of privacy***)**. …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

"**NOT "permitting** the release of education records . . . of students without the[ir] written consent **(***i.e. reasonable expectation of privacy***)**" - Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8 (D.D.C. Apr. 10, 2020)

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. '**The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:
- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);

- name (this includes nicknames and former names);
- voice; or
- signature.
*Make sure you have permission before using a person's image or likeness.....*"

- **Georgetown University Library)**

The broad, but specific, categories of privacy violations that Georgetown themselves help to articulate as part of a reasonable expectation of privacy for students (above cited argument & Georgetown *public* references), illustrate at least two ways that Georgetown specifically violated Mr. Austin's privacy, and publicity rights (*as well as Equal Protection , 42 USC 1981, Duties to not violate Deceit, Negligence and Bad Faith rights*).  See e.g. Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015) (""Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded." Wolf v. Regardie, 553 A.2d 1213, 1216–17 (D.C.1989). "In the District of Columbia, courts have adopted the Second Restatement of Torts to 'determin[e] the appropriate contours of a cause of action for' invasion of privacy." Budik v. Howard Univ. Hosp., 986 F.Supp.2d 1, 11 (D.D.C.2013) (citing Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 587 (D.C.1985) (brackets in original)). "The four constituent torts are (1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit."")

50.    Georgetown *knows* both DC's and California's jurisdictions affirm that Georgetown's conduct using an up close photo without his consent, nor knowledge, nor written agreement, was violative of Mr. Austin's privacy, and publicity rights. The Supreme Court has also repeatedly re-affirmed this position directly.  See e.g.

Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 n.7 (1977) (""The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff . . . 'to be let alone.'" Prosser, Privacy, 48 Calif. L. Rev., at 389. Thus, according to Prosser, some courts had recognized a cause of action for "intrusion" upon the plaintiff's seclusion or solitude; public disclosure of "private facts" about the plaintiff's personal life; publicity that places the plaintiff in a "false light" in the public eye; and "appropriation" of the plaintiff's name or likeness for commercial purposes. One may be liable for "appropriation" if he "pirate[s] the plaintiff's identity for some advantage of his own." Id., at 403. See, for example, W. Prosser, Law of Torts 842 (3d ed. 1964); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y. U. L. Rev. 962, 986-991 (1964)")  See also e.g. Time, Inc. v. Hill, 385 U.S. 374, 380-81 (1967) ("traced the theory to the celebrated article of Warren and Brandeis, entitled The Right to Privacy, published in 1890. 4 Harv. L. Rev. 193. … observed that "[t]he legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent…..the appropriation and use in advertising or to promote the sale of goods, of another's name, portrait or picture without his consent.")

51.    Not only was Georgetown aware, but *admits publicaffairs.georgetown.edu/ communications/policies/policy-for-filming-at-georgetown-university/,* and it is

commonly understood that their conduct violated his reasonable expectation of

privacy, especially as an admitted student in the forum state of California. See e.g.

Air Transport Ass'n of America v. Public Utilities Commission of California - 833

F.2d 200 (9th Cir. 1987) (In California, a citizen's interest in privacy has been raised

to the dignity of an express state constitutional right. See Cal. Const. art. I, § 1.

California has seen fit to protect this right with statutes providing criminal

sanctions for.. one's privacy [violation], as well as a statutory civil cause of action

for..person whose rights are violated)  See e.g. Laws v. Sony Music Entertainment,

Inc., 448 F.3d 1134, 1141-42 (9th Cir. 2006) ("Laws points to two cases for support.

Both cases, however, involve photographs used in advertising, … published the

photo in connection with a broad … advertising campaign, …. [the violation]… is

the use of the [plaintiffs'] likenesses …. in the published photograph."….. . . . The

defendants did not have her consent to continue to use the photograph.")  See also

e.g. Hill v. National Collegiate Athletic Ass'n, 18 Cal.App.4th 1290, 1294 (Cal. Ct.

App. 1990) ("However, California Constitution article 1, section 1, was intended to

reach both governmental and nongovernmental conduct. (Wilkinson v. Times Mirror

Corp. (1989) 215 Cal.App.3d 1034, 1041-1043, 264 Cal.Rptr. 194.) That section

"provides: 'All people are by nature free and independent and have inalienable

rights. Among these are enjoying and defending life and liberty, acquiring,

possessing, and protecting property, and pursuing and obtaining safety, happiness,

and privacy.' By this provision, California accords privacy the constitutional status

of an inalienable right, on a par with defending life and possessing property.

[Citation.]" (Luck v. Southern Pacific Transportation Co. (1990) 218 Cal.App.3d 1, 15, 267 Cal.Rptr. 618.) "Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone." (Porten v. University of San Francisco (1976) 64 Cal.App.3d 825, 829, 134 Cal.Rptr. 839, fn. omitted.)")

52.     Nationally, it is clear, and codified in various forms (applying to a variety of contexts), that Georgetown's behavior violates privacy, and publicity rights for admitted students (*publicaffairs.georgetown.edu/communications/policies/ policy-for-filming-at-georgetown-university/*).  See e.g. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 488 (1975) ("More compellingly, the century has experienced a strong tide running in favor of the so-called right of privacy. In 1967, we noted that "[i]t has been said that a `right of privacy' has been recognized at common law in 30 States plus the District of Columbia and by statute in four States." Time, Inc. v. Hill, 385 U.S. 374, 383 n. 7. We there cited the 1964 edition of Prosser's Law of Torts. The 1971 edition of that same source states that "[i]n one form or another, the right of privacy is by this time recognized and accepted in all but a very few jurisdictions." W. Prosser, Law of Torts 804 (4th ed.)") See also e.g. Davis v. Fed. Election Comm'n, 554 U.S. 724, 744 (2008) (" "[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Buckley, 424 U.S., at 64, 96 S.Ct. 612.") See also e.g. TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete. Chief among them are injuries with a close

relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Id. , at 340–341, 136 S.Ct. 1540. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. See, e.g., …Davis v. Federal Election Comm'n , 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (disclosure of private information); see also Gadelhak v. AT&T Services, Inc. , 950 F.3d 458, 462 (CA7 2020) (Barrett, J.) (intrusion upon seclusion).")

54.     As Georgetown *publicly admits (publicaffairs.georgetown.edu/ communications/policies/policy-for-filming-at-georgetown-university* /) privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable.  See e.g. Maracich v. Spears, 570 U.S. 48, 48-49 (2013) ("Held: An attorney's solicitation of clients is not a permissible purpose covered by the (b)(4) litigation exception. Pp. 57-78, 186 L. Ed. 2d, at 286-299. (a) State DMVs generally require someone seeking a driver's license or registering a vehicle to disclose detailed personal information such as name, address, telephone number, Social Security number, and medical information. The DPPA--responding to a threat from stalkers and criminals who could acquire state DMV information, and concerns over the States' common practice of selling such information to direct marketing and solicitation businesses--bans disclosure, absent a driver's consent, of "personal information," e.g., names, addresses, or telephone numbers, as well as "highly restricted personal

information," e.g., photographs, Social Security numbers, and medical or disability

information,")

55.     Georgetown not only violated privacy, and publicity rights of Mr. Austin, but

purposefully availed when it a. specifically targeted Mr. Austin's forum state of

California (utilizing his up close photo without his consent, nor knowledge in

violation of both privacy, and publicity rights), b. Did "something more" including

multiple mailed physical copies, *likely thousands*, of advertisements to forum state,

and presented physical copies including said privacy violating photo of Mr. Austin,

and separately maintained interactive website for advertising, commercial,

purposes of the multi-billion dollar organization.  See e.g. Mavrix Photo Inc. v.

Brand Techs. Inc., 647 F.3d 1218, 1229 (9th Cir. 2011) ("we have held that

"operating even a passive website in conjunction with 'something more'—conduct

directly targeting the forum—is sufficient." Rio Props., 284 F.3d at 1020. In

determining whether a nonresident defendant has done "something more," we have

considered several factors, including the interactivity of the defendant's website,

e.g., Pebble Beach, 453 F.3d at 1153–54, 1158; Cybersell, 130 F.3d at 417–20; the

geographic scope of the defendant's commercial ambitions, e.g., Pebble Beach, 453

F.3d at 1156–58; Rio Props., 284 F.3d at 1020–21; and whether the defendant

"individually targeted" a plaintiff known to be a forum resident, e.g., Brayton

Purcell, 606 F.3d at 1129; Pebble Beach, 453 F.3d at 1156–57; Panavision, 141 F.3d

at 1321–22. In this case, we find most salient the fact that Brand used Mavrix's

copyrighted photos as part of its exploitation of the California market for its own

commercial gain. The Court's decision in Keeton is directly relevant. See

Schwarzenegger, 374 F.3d at 803")

58.    As soon as a Georgetown Dean, and Leadership, Mitch Bailin admitted in

writing to using my photo to market the school without asking my permission, nor

informing me, nor getting my written consent, Mr. Austin immediately began a

series of questions, and formal complaints to ascertain and figure out why they

chose to "impermissibly use race" (*and perhaps gender*) to treat, me, a Black man,

and admitted student with less respect, less rights, and in an inferior manner than

other similarly situated admitted students with use of material misrepresentations,

omissions and deceit (with malice) to deprive Mr. Austin (*in direct violation of their*

*explicitly publicly stated contract, and policy terms*).

> "Privacy Policy: In keeping with *state and federal legislation*, the University safeguards the
> privacy of patients, **students**, employees, University business, and other matters by
> protecting electronic records classified as confidential information. *Unauthorized accessing
> and/or disclosure of confidential information by University* employees is *prohibited* and may
> result in legal penalties. This policy applies to records maintained in any type of electronic
> record: computer, voice, or video. It also applies to records created via the Georgetown
> University website." - www.georgetown.edu/privacy-policy/

> "Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......**Georgetown complains**
> that ... requiring it to report .... **forces the University to violate the Federal Educational Rights and**
> **Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the
> release of allegedly protected information regarding students who live off campus. ....FERPA protects students '
> privacy interests by withholding federal financial assistance to educational institutions that ...release .. educational
> records" ..... Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN**
> **COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

> "As with any other "education record," a photo or video of a student is an education record, subject to specific
> exclusions, when the photo or video is: (1) directly related to a student; and (2) maintained by an educational agency
> or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood*
> *reasonable expectation of privacy*). .... If a school maintains a close-up photo of two or three students playing
> basketball with a general view of student spectators in the background, the photo is directly related to the
> basketball players because they are the focus of the photo" -
> studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa



GEORGETOWN UNIVERSITY LAW CENTER

Office of the Dean of Students

February 28, 2019

George Austin
███████████
██ CA ███

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

59.    Over four years later, and within that time over 50+ formal complaints of

intentional discrimination exhibited in inferior treatment by Georgetown (*combined

with other enumerated causes of action*) to IDEAA (*the investigative, and

enforcement body tasked with correcting these issues for admitted students, staff,

and members of the public: third parties*), since Georgetown's initial admission of

violative use of my image, or likeness, per Mitch Bailin (*see above*)  they have not

yet even taken a mandatory perfunctory, or performative, first step towards *any*

investigation, let alone any substantive investigation, correction or enforcement,

whatsoever (despite the fact that is precisely what Georgetown's agreement or

contract mandates once complaint is made by students, staff, or third party

community members).

"A. Institutional Diversity, Equity, and Affirmative Action: Grievance Procedures to
Investigate Allegations of Discrimination and Harassment Introduction

Georgetown University complies with federal laws and regulations and the District of
Columbia Human Rights Act and acts in accordance with the University's Affirmative Action
Plan. Therefore, the University has established these grievance procedures for the Office of
Institutional Diversity, Equity, and Affirmative Action ("IDEAA") to review, investigate, and
resolve alleged violations of the University's Equal Opportunity and Non-Discrimination in
Employment and Non-Discrimination in Education Policies, Affirmative Action Policy, the
Policy Statement on Harassment, and the Policy on Sexual Misconduct.1

The procedures outlined below cover allegations of unlawful discrimination and harassment
in employment or education on the basis of age, color, disability, family responsibilities,
gender identity and expression, genetic information, marital status, matriculation, national
origin, personal appearance, political affiliation, race, religion, sex, sexual orientation,
veteran status and other factors prohibited by law.

These internal Grievance Procedures to Investigate Allegations of Discrimination and
Harassment **provide a mechanism for faculty, staff, students, third parties and
applicants** for employment and admission to receive a **prompt, fair, and impartial
investigation and resolution of grievances of discrimination, harassment, and
related retaliation.**

**The University strongly encourages Complainants** (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) **to report** the incident and seek redress through IDEAA's Grievance Procedures. The **University will provide a prompt investigation as well as a thorough and careful resolution**. Individuals may use these procedures to address off-campus behaviors, which may violate the policies on harassment and discrimination as they relate to educational and employment opportunities. Individuals with questions about these grievance procedures may reach out to IDEAA at **ideaa@georgetown.edu** or (202) 687-4798." - facultyhandbook.georgetown.edu/section4/a/

61.     After admissions of their violated policy, Georgetown Leadership showed repeated *deliberate indifference,* and *malice,* over 50+ times, when they failed to correct their displayed discriminatory animus, as well as their material omissions, misstatements and ongoing pattern of fraud to deprive Mr. Austin of rights, opportunity, and spent Capital.  Despite their known, and publicly admitted duties to correct, Georgetown then over 50+ times in over 4 years displayed disparate treatment compared to similarly situated non-Black male admitted students by employing one IDEAA policy for Black male admitted students to their immediate detriment, and one for non-Black male admitted students to non-Black male unfair advantage.  The first *publicly defined mandatory* step for Georgetown's IDEAA policy (regardless of perceived merit, race or gender) is defined as acknowledgement and receipt (as applied for non-Black male admitted students).  However, in practice, Georgetown's conduct *admits* they not only continually refuse the first step, but all of the following mandated steps, with regard to Black male admitted students, and subject Black male Complainants to an inherently inferior IDEAA policy to their detriment, as applied, versus non-Black male admitted students.  See e.g. Cbocs West, Inc. v. Humphries, 553 U.S. 442, 461 n.2 (2008) ("Of course, if an [organization; i.e. Georgetown] had a different retaliation policy for [B]lacks and

[W]hites—[adverse action against] [B]lack [people] who complain of race discrimination but [no adverse action for] similarly situated [W]hite [students]—a [B]lack [student] who [experienced adverse action] for complaining of race discrimination would have a promising § 1981 claim…. it would be a straightforward claim of racial discrimination."). Georgetown's different privacy, and complaint or conflict resolution policy for Black men, and in this case facially discriminatory privacy, and complaint, policy based on impermissible use race, or derogatory racial stereotypes, for Black male admitted students vs. similarly situated non-Black male admitted students highlights this very straightforward, and promising, section 1981 claim.

62.     Georgetown *knows and admits* use of derogatory stereotypes constitutes discrimination and is an impermissible use of race.

> https://policymanual.hr.georgetown.edu/1000-university-policies/1004-policy-statement-on-harassment/ (Harassment is a form of discrimination prohibited by law. It is the policy of Georgetown University to prohibit harassment (and discrimination) on the basis of …. color, …. gender …. race… ("Protected Categories")… Harassment may include… slurs, epithets, and stereotyping; … and …. conduct carried out through the internet, email…is especially serious when it occurs between teachers and [students] or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly exploits the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University …. This Policy Statement …. will be widely disseminated to members of the University community, and will be consistently enforced.)

63.     Georgetown *admits, and knows,* that use of derogatory racial stereotyping

evidenced by words, or conduct (*including exclusion or disparate treatment*) is

illegal, and against its own policy; Yet, Georgetown *admits, and evidences* this

illegal conduct to "mark with a badge of inferiority" *intentionally,* and *deliberately* -

Badge of inferiority citations

> https://policymanual.hr.georgetown.edu/1000-university-policies/1004-policy-s
> tatement-on-harassment/ (Harassment is a form of discrimination prohibited by law. It is the policy of
> Georgetown University to prohibit harassment (and discrimination) on the basis of …. color, …. gender …. race…
> ("Protected Categories")… Harassment may include… slurs, epithets, and stereotyping; … and …. conduct carried
> out through the internet, email…is especially serious when it occurs between teachers and students or supervisors
> and subordinates.  In such situations, harassment [or discrimination] unfairly exploits the power inherent in a
> faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one
> person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown
> University …. This Policy Statement …. will be widely disseminated to members of the University community, and
> will be consistently enforced.)

64.     Georgetown *admits, and knows* that use of derogatory stereotypes illegally

creates stigma whether in a forced '*De Jure'* segregation context like *Brown v.*

*Board of Education* or in an integrated, but *De Facto discriminatory* context toward

protected groups, especially those historically racially oppressed, victimized, and

excluded by vis a vis enslavement, debt peonage, torture, and many other nefarious

mechanism.  See e.g. Bradley v. T-Mobile US, Inc., No. 17-cv-07232-BLF, at *18

(N.D. Cal. Mar. 13, 2020) ("Stigmatic injury—i.e., "stigmatizing members of the

disfavored group as innately inferior and therefore as less worthy"—certainly may

confer Article III standing in discrimination cases. Heckler v. Mathews, 465 U.S.

728, 739 (1984).")  See also e.g. Brown v. Board of Education, 347 U.S. 483, 487 n.1

(1954)

> ("The Chancellor also found that segregation itself results in an inferior education for Negro children (see note 10,
> infra), but did not rest his decision on that ground. Id., at 865. The Chancellor's decree was affirmed by the Supreme
> Court of Delaware, which intimated, however, that the defendants might be able to obtain a modification of the
> decree after equalization of the Negro and white schools had been accomplished. 91 A.2d 137, 152. ")

("To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs: "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority.")

("Slaughter-House Cases, 16 Wall. 36, 67-72 (1873); Strauder v. West Virginia, 100 U.S. 303, 307-308 (1880): "It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but Page 491 declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race, — the right to exemption from unfriendly legislation against them distinctively as colored, — exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." See also Virginia v. Rives, 100 U.S. 313, 318 (1880); Ex parte Virginia, 100 U.S. 339, 344-345 (1880).")

65.     *Any* of the Leadership of Georgetown could have, and according to their policy *should* have spoken up as the *ongoing* disparate treatment of Mr. Austin was documented on display, in front of them, but instead chose *deliberate indifference* furthering their discriminatory animus, conduct, and malice;  Georgetown's IDEAA policy is designed to mandate Georgetown stakeholders (*especially Administrative Leadership*) to "Lift Every Voice" against anti-Black discriminatory conduct as James Weldon Johnson (*from Duval County, Jacksonville Florida*), the first self identified Black man (Negro) barred attorney in the State of Florida *after* the Civil War, and Reconstruction, brilliantly wrote:

"Lift every voice and sing
Till earth and heaven ring,
Ring with the harmonies of Liberty;
Let our rejoicing rise
High as the listening skies,
Let it resound loud as the rolling sea.
Sing a song full of the faith that the dark past has taught us,
Sing a song full of the hope that the present has brought us.
Facing the rising sun of our new day begun,
Let us march on till victory is won.

Stony the road we trod,

Bitter the chastening rod,
Felt in the days when hope unborn had died;
Yet with a steady beat,
Have not our weary feet
Come to the place for which our fathers sighed?
We have come over a way that with tears has been watered,
We have come, treading our path through the blood of the slaughtered,
Out from the gloomy past,
Till now we stand at last
Where the white gleam of our bright star is cast.

God of our weary years,
God of our silent tears,
Thou who hast brought us thus far on the way;
Thou who hast by Thy might
Led us into the light,
Keep us forever in the path, we pray.
Lest our feet stray from the places, our God, where we met Thee,
Lest, our hearts drunk with the wine of the world, we forget Thee;
Shadowed beneath Thy hand,
May we forever stand.
True to our God,
True to our native land."

- **James Weldon Johnson, first self identified Black man (Negro) barred attorney in the State of Florida *after Reconstruction,* Lift Every Voice and Sing  (**"*A group of young men in Jacksonville, Florida, arranged to celebrate Lincoln's birthday in 1900.*

- *My brother, J. Rosamond Johnson, and I decided to write a song to be sung at the exercises. I wrote the words and he wrote the music. Our New York publisher, Edward B. Marks, made mimeographed copies for us, and the song was taught to and sung by a chorus of five hundred colored school children.*

- *Shortly afterwards my brother and I moved away from Jacksonville to New York, and the song passed out of our minds. But the school children of Jacksonville kept singing it; they went off to other schools and sang it; they became teachers and taught it to other children. Within twenty years it was being sung over the South and in some other parts of the country. Today the song, popularly known as the (Black) Negro National Hymn, is quite generally used.*

- *The lines of this song repay me in an elation, almost of exquisite anguish, whenever I hear them sung by Negro (Black) children.*") **http://jamesweldonjohnson.emory.edu/about/about-james-weldon-johnson.html** ; **https://www.floridabar.org/about/diversity/legal-legends-pioneers-on-the-florida-bars-path-to-unity/** **(***Johnson was born in Jacksonville in 1871. In 1897, he became one of the first African Americans to be admitted to The Florida Bar. He was also a writer, diplomat, social critic, civil-rights advocate, and leader of the National Association for the Advancement of Colored People. He is widely remembered as the author of the words to Lift Every Voice and Sing, often referred to as the Black National Anthem.***)** **https://naacp.org/find-resources/history-explained/civil-rights-leaders/james-weldon-johnson#:~:text=Dual% 20career%20in%20education%20and%20law&text=Once%20he%20became%20principal%2C%20Johnso n,the%20Florida%20Bar%20since%20Reconstruction.**

67.    Georgetown *knows, and admits,* that a "thumb on the scale" to *reinforce*, not

correct "the badges and incidents" of anti-Black slavery and oppression through

"impermissible use of race" or derogatory racial stereotypes to exclude Black male

admitted students from essential programs or activities not only creates stigma, but

gives unfair advantage to non-Black male admitted students perverting the outcomes in what is regarded as a "zero sum game" to the immediate detriment of Black male admitted students.  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. No. 20-1199 (U.S. Jun. 29, 2023) (For present purposes, it is significant that, *in so excluding Black people*, government policies affirmatively operated…., affirmatively acted-to dole out preferences [creating *unfair advantage for centuries]* to those who …. were *not Black [,helping to create massive racial wealth inequality and other societal racial markers of inequity; injustice))*  See also e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023) ("[*Georgetown's privacy, and internal complaint or conflict resolution*] systems also fail to comply with the Equal Protection Clause's [co-existent with section 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zerosum, and a benefit provided to some [students] but not to others necessarily advantages the former at the expense of the latter.")")  See also e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023) ("[Georgetown's privacy, and complaint structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way the operated]-the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s] …. Such stereotyping is contrary to the "core purpose" of the Equal Protection Clause. Palmore, 466 U.S., at 432. Pp. 2629.")  See also Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 143-44 (U.S. Jun. 29, 2023):

("Yet emancipation marked the beginning, not the end, of that era. Abolition alone could not repair centuries of racial subjugation. Following the Thirteenth Amendment's ratification, the Southern States replaced slavery with "a system of 'laws which imposed upon [Black people] onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value.'" Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 390 (1978) (opinion of Marshall, J.) (quoting Slaughter-House Cases, 16 Wall. 36, 70 (1873)). Those so-called "Black Codes" discriminated against Black people on the basis of race, *regardless of whether they had been previously enslaved*. See, e.g., 1866 N. C. Sess. Laws pp. 99, 102. Moreover, the criminal punishment exception in the Thirteenth Amendment facilitated the creation of a new system of forced labor in the South. Southern States expanded their criminal laws, which in turn "permitted involuntary servitude as a punishment" for convicted Black persons. D. Blackmon, Slavery by Another Name: The ReEnslavement of Black Americans From the Civil War to World War II, pp. 7, 53 (2009) (Slavery by Another Name). States required, for example, that Black people "sign a labor contract to work for a white employer or face prosecution for vagrancy." The Second Founding 48. State laws then forced Black convicted persons to labor in "plantations, mines, and industries in the South." Id., at 50. This system of free forced labor provided tremendous benefits to Southern [W]hites and was designed to intimidate, subjugate, and control newly emancipated Black people. See Slavery by Another Name 5-6, 53. The Thirteenth Amendment, without more, failed to equalize society."

"Civil Rights Act of 1866 contemporaneously with the Fourteenth Amendment. The goal of that Act was to eradicate the Black Codes enacted by Southern States following ratification of the Thirteenth Amendment. See id., at 474. Because the Black Codes focused on race, not just slavery-related status, the Civil Rights Act explicitly recognized that white citizens enjoyed certain rights that non-white citizens did not. Section 1 of the Act provided that all persons "of every race and color . . . shall have the same right[s]" as those "enjoyed by white citizens." Act of Apr. 9, 1866, 14 Stat. 27.")

"That's why I'm saying if you .... real ..., you just gonna have to hold on to the fact you ... real .... because it's getting ready to change. It ain't *just* about color. They hate all real [people]. I'm gonna give you a prime example.  There's a [W]hite boy that ran track for a ...living. ... and he lost both of his .... legs. Now I hate losers and quitters, but I feel like if you run for a ... living, and you lose both of your ....legs, you should be allowed to sit this [one]  out....

You have done everything there was for you to do.

And this m*therf*ck*r, on some [g-]sh*t, decide not only is he gonna walk again, he decide he gonna ...race again.

Now, you got to be in tune with you f*ck*ng star player to pull this ... off 'cause they made him some aluminum racing legs ...., looked like bent-back paper clips and sh*t, yes.....It looked like bent-back paper clips, like two baby boomerangs and sh*t... That's what he had to run on.

[He] had to be in tune with his star f*ck*ng player

'cause sometimes, m*therf*ck*rs ain't gonna have your back like you think they should. And this m*th*rf*ck*r now got to come in on his aluminum racing legs and race again, and he got to try and come in and be all calm and smooth and not draw too much attention to himself.

Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink.Tink. (Sound of the aluminum legs)

M*th*rf*ck*rs f*ck*ng with him and sh*t.: "Yeah, you got to go over there and sign up first before you race."

"Oh, okay,...." [jogging across the stage] Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink. Tink. (Sound of the aluminum legs)

"Yeah, they said I got to sign up first?

[realizing they were lying..] Yeah, so [there's] no sign up at all?"....

....And he all at the starting line. You know m*th*rf*ck*rs f*ck*ng with him, doing all sorts of unnecessary exercises with they legs and sh*t.....

And the craziest ...thing happened. [He] not only started running. This m*th*rf*ck*r started winning.

And you know a hater can't stand a g*dd*mn winner, and the last place you want to be in is a …. footrace behind the m*th*rfuck*r with no g*dd*mn "foots".....

I bet that [they] was mad as sh*t: "My legs tired ain't your legs tired?... His legs ain't tired."

He's just Tink. Tink. Tink. Tink. …. Just paper clips and sparks everywhere…

But you gonna have to be in tune with your star f*ck*ng player 'cause these haters *do not* play fair….

These hating-*ss m*th*rf*ck*rs …. let [him] race and then waited til he won and then disqualified him and said, and I quote:

"He had an unfair advantage."

[raises hand] …. "Are you talking about the m*th*rf*ck*r running with no g*dd*mn legs? ….Is that who the f*ck you talking about?"

Poor little Tink Tink.

That's why you gonna have to be in tune with your star … player."
- **Kat Williams (Comedian; Social Critic; Musician-Actor)**

"You tired?"
- **Denzel Washington's Jake Shuttlesworth to Jesus Shuttlesworth (Ray Allen's character), He Got Game, A Spike Lee Joint**

"No rest for the weary"
- **Lawrence Cook's Turk, The Spook who Sat By the Door by Sam Greenelee**

68.     Georgetown *knows, and admits,* that the enslavement period, as well as the 'badges and incidents' of that period, (*that are still reflected in US society today in anti-Black discriminatory conduct*) was not just a bad chapter in US history, but a fundamental *theft* of Black men's, and Black people's, rights, history, language, culture, personhood, life, liberty, land, and property resulting in massive wealth redistribution (from Black people via theft) with resulting *ongoing* inequality *still* to the detriment of African American or Black men, and people, today in 2023.  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. No.

20-1199 (U.S. Jun. 29, 2023)( Slavery by Another Name: The ReEnslavement of

Black Americans From the Civil War to World War II, pp. 7, 53 (2009) (Slavery by

Another Name). States required, for example, that Black people "sign a labor

contract to work for a [W]hite employer or face prosecution for vagrancy." The

Second Founding 48. State laws then forced Black convicted persons to labor in

"plantations, mines, and industries in the South." Id., at 50. This system of free

forced labor provided tremendous benefits to Southern whites and was designed to

intimidate, subjugate, and control newly emancipated Black people. See Slavery by

Another Name 5-6, 53. The Thirteenth Amendment, without more, failed to

equalize society…. "Three hundred and fifty years ago, the Negro [Black people]

was [were] dragged to this country in chains to be sold into slavery. Uprooted from

his homeland and thrust into bondage for forced labor, the [en]slave[d] was deprived

of all legal rights. It was unlawful to teach him to read; he could be sold away from

his family and friends at the whim of his master; and killing or maiming him was

not a crime. The system of slavery brutalized and dehumanized both master and

slave." Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 387-388 (1978).)

"The story of Black people in America is, among other things, the story of a quest for the hard rock of economic security.  This quest, under-girding all, overshadowing all, gives shape and body to all the strivings of Black men and women. Behind the demonstrations, behind the petitions and protests and revolts, behind Jamestown and Montgomery and Watts, lies this deeper and more basic struggle for bread, shelter, clothing, land, raw materials, resources, skills, and space for the heart.  Let there be no misunderstanding: This deeper struggle is not, as some have said, a detour from freedom; it is, on the contrary, the very essence of freedom.  For freedom is, above all else, the freedom to do.  And a freedom divorced from an economic foundation, a freedom divorced from the wherewithal, cannot guarantee anything except the freedom to talk or the freedom to starve."

- **Professor Lerone Bennett Jr., *Shaping of Black America***

69.    Because a significant proportion of Black Wealth is generated from earned income, often directly connected to educational opportunities for white collar or professional workers, the nexus between Black educational development, Wealth creation, and in this case Mr. Austin's Constitutional economic contract rights intertwined with property, privacy and publicity mandating a written authorization agreement, Georgetown's discriminatory conduct represents key missed opportunities, to combine with outright illegal conduct.

- https://www.brookings.edu/articles/closing-the-racial-wealth-gap-requires-heavy-progressive-taxation-of-wealth/ (Unfortunately, policymakers have often put the responsibility for fixing centuries of racial inequity back on the shoulders of Black people. For decades, elected officials argued that personal choices explained racial disparities. These claims have been thoroughly debunked. As economists Trevon Logan and Darrick Hamilton have demonstrated: [G]reater educational attainment, harder work, better financial decisions, and other changes in habits and practices on the part of [B]lacks … are wholly inadequate to bridge the racial chasm in wealth.  Even when Black people have advanced degrees, own their home, have high paying jobs, and engage in other behaviors associated with asset building, their wealth is typically much lower than their white peers. Individual-level factors are simply not the explanation for the difference in the economic fortunes of Black and [W]hite people.  Instead, the racial wealth gap should be recognized as the consequence of discrimination, public and private, throughout American history and continuing to this day. Nearly 250 years of slavery were followed by a century of Jim Crow segregation and economic exploitation reinforced by state-sanctioned violence. Until the later 20th Century, Black people were excluded from public programs to encourage homeownership and higher education. Racial inequality persists in our contemporary, putatively color-blind system; due to discrimination, Black people receive lower valuations on their homes and earn less money compared to white people performing the same work. Biases in public investment and criminal justice leave Black communities simultaneously underserved and overpoliced, and these civil rights violations also have serious economic consequences.  Black people in America have been systematically stripped of the wealth they have produced. Only a transformative national agenda can address the racial wealth gap, because the disparity is the product of societal racism, compounded over generations.)

70.    Given the history, and present reality, of Racial Abuse in this country, the Judicial Branches complicit, or explicit, refusal to enforce anti-Black anti-discrimination laws as it relates to Black People especially magnifies the impact of racism, discrimination, and widens the wealth gap.  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 106 (U.S. Jun. 29, 2023) ("The great failure of this country was [African, Black, so called Negro or African American] slavery and its progeny [i.e. Jim Crow, Convict Lease

System, and New Jim Crow]. And, the tragic failure of this Court was its misinterpretation of the Reconstruction Amendments, as Justice Harlan predicted in Plessy")  Non-enforcement of Black People's rights, *currently in 2023,* as Georgetown themselves are demonstrating in disparate treatment of Mr. Austin per *mandatory (not optional) policies*, a Black male admitted student, is a serious part and parcel of why the Black White Wealth Gap remains a constant *ongoing* issue:

- www.aclu.org/news/racial-justice/the-racial-wealth-gap-is-a-civil-liberties-issue (When President Lincoln signed the Emancipation Proclamation in 1863, former [enslaved Black people] owned 0.5 percent of the nation's wealth. Over 150 years later, the descendants of those [enslaved Black people] own just 1 percent of the nation's total wealth. In other words, even emancipation, civil rights, increases to education, and improved employment have not substantially advanced Black people's democratic participation in our economic system...racial discrimination persists to worsen the situation — and this is the key: Discrimination persists in part because Black people's subordinate economic position left them with little ability to resist. Ongoing labor market discrimination by the government, unions, and private employers, topped off by housing segregation, forces most Black Americans into unstable jobs with poor wages and a lack of essential retirement benefits.)
- heller.brandeis.edu/iere/pdfs/racial-wealth-equity/racial-wealth-gap/roots-widening-racial-wealth-gap.pdf (Black-White Wealth Gap Getting Worse, 160 Years of US Data Show)
- www.bloomberg.com/news/articles/2022-06-07/black-white-wealth-gap-getting-worse-160-years-of-us-data-show
- www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.html
- (Racial wealth gap may be a key to other inequities) news.harvard.edu/gazette/story/2021/06/racial-wealth-gap-may-be-a-key-to-other-inequities/
- The black-white economic divide is as wide as it was in 1968 (www.washingtonpost.com/business/2020/06/04/economic-divide-black-households/)
- (Why the racial wealth gap persists, more than 150 years after [nominal] emancipation: When one system of economic oppression collapsed, new ones were created to fill the void. )
- (www.washingtonpost.com/outlook/2019/06/19/why-racial-wealth-gap-persists-more-than-years-after-emancipation/

71.     Georgetown's deprivation of Mr. Austin's Constitutional economic rights to contract, as a Black male admitted student, reflects the long ugly history in the United States of America regarding the intersection of Intellectual Property, which rights of publicity is a part of (as a subset of privacy), with use of derogatory racial stereotypes, racial oppression, and *theft* of Black wealth and economic rights.

- https://pennstatelaw.psu.edu/sites/default/files/documents/Presentation_Intellectual_Property_Contributes_to_Wealth_Gap.pdf
  - An Analysis of How Intellectual Property Law Contributes to the Wealth
  - Gap Between White and Minority Businesses.
- https://archives.law.nccu.edu/cgi/viewcontent.cgi?article=1007&context=siplr

INTELLECTUAL PROPERTY, INCOME INEQUALITY, AND SOCIETAL INTERCONNECTIVITY IN THE UNITED STATES: SOCIAL CALCULUS AND THE HISTORICAL DISTRIBUTION OF WEALTH; Scant attention has been paid to the historical trajectory and effect of the United States' intellectual property regimes—patenting, copyrighting, and trademarking—as devices which implement racialized property grants and further income and social inequality. This article focuses on just that and argues that the United States Constitution was designed as a property-based and economically-driven social compact which identifies intellectual property interests through a racialized lens.

- https://www.brookings.edu/articles/the-black-innovators-who-elevated-the-united-states-reassessing-the-golden-age-of-invention/
    - The Black innovators who elevated the United States: Reassessing the Golden Age of Invention

- https://www.npr.org/transcripts/876097416
    *"PATENT RACISM: PLANET MONEY (NPR)*
    *Racist attacks… stifles innovation and the economy. Dr. Lisa Cook*

    CHILDS: And to Lisa, the reason seemed clear. Like, sure there were laws, but no one seemed to enforce them….

    DUFFIN: If you're afraid for your life, you're probably not inventing things….

    CHILDS: Also, Romer's big innovation theory assumes that the law is enforced equally. And Lisa knows very personally, for example from her childhood in Georgia, that equal treatment is not guaranteed.

    COOK: Yeah. I mean, I was desegregating schools along with my sisters, and I was beaten - you know, I was beaten up. I still have scars from that - scar where hair won't grow in my eyebrow and a scar on my leg from having been beaten during that period, during the period of desegregation.

    DUFFIN: So Lisa is pretty sure she's found a blind spot in that hot new economic theory. She suspects that there is more to fostering innovation than just science schools and patent laws. Maybe innovation also requires safety and equality.

    CHILDS: To test her hunch, she needs to find a pool of inventors where some were subject to violence and inequality and others weren't. She thinks, now, where could I find such a dataset?

    COOK: So, of course, you know, knowing a little bit about American history, I knew that African American inventors were subject to the things that started happening to African Americans around the period of the end of Reconstruction, when lynchings were largely at their peak and when segregation laws were being put into place, and thereafter.

    DUFFIN: And this is how Lisa Cook decided to study the very things that people are protesting right now - violence against [B]lack people and the unequal enforcement of law - and whether those things stunt innovation."
- https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=1263&context=penn_law_review_online
    "The United States government owes African-Americans reparations for the harm of the Transatlantic Slave Trade. Existing reparations scholarship focuses on remedying losses related to real property, healthcare disparities, mass incarceration, and educational opportunities. But reparations for the Transatlantic Slave Trade must also include the value of patents historically denied to African-Americans. Revolutionary contributions from enslaved Black inventors and their descendants catapulted the United States to the top of the global economy. However, the United States denied enslaved Black people the right to property, including intellectual property to maximize the profitability of their inventions. After emancipation, structural racism and racial violence continued to ostracize African-Americans from the patent system until their inventive activity plummeted in the late 1800s. The Transatlantic Slave Trade's legacy endures in the patent context: its violence has contributed to the underrepresentation of African-American patent applicants and awardees, stark disparities in income and economic mobility, and forgone inventive contributions. This harm warrants a comprehensive reparations package that confronts gaps in white and African-American inventive activity."
- https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1553&context=chtlj
    "My intellectual property (IP) scholarship was among the first to explore the impact of intellectual property rights on AfricanAmerican cultural production—and vice-versa.1 …[T]he history of [B]lack artists and performers is inextricably tied to legal structures, such as copyright law, and social structures, such as racial discrimination.2 Although [B]lack artists and performers shaped American culture by pioneering whole musical art forms, from ragtime to hip-hop,3 the work of pioneering blues and jazz artists was often deprived of copyright protection.4 Other forms of IP impacted the central issue of race in America in other ways. I previously showed how trademark law played a critical role in promoting widespread dissemination of some of America's pernicious and

enduring racial stereotypes.5 The trademarked imagery of characters from Sambo to Aunt Jemima sold products by **pandering to the [derogatory] cultural stereotypes of the day**."

72.     Georgetown is aware that their impermissible use of race, and discriminatory conduct, goes deeper and is rooted in some of the ugliest parts of American history, and racist jurisprudence; Georgetown is *intentionally* depriving Mr. Austin's rights, despite knowing his rights as Black admitted student are guaranteed under 42 USC 1981, Equal Protection, 13th, and 14th Amendments after Civil War.   The Reconstruction Civil Rights Amendments, along with the Civil War, overturned the most racist, and embarrassing *Dred Scott decision,* so racist *in its* complete, and utter, disrespect for ALL Black Life, and Black Persons rights that it *delegitimized* the US Supreme Court of its day: triggering Civil War: Apr 12, 1861 – Apr 9, 1865 (no matter enslaved or free, as it presumed *inferiority* and assumed Black People did not have *any* Rights to be respected by *any* White Person) See e.g.

www.civilwarmo.org/ educators/resources/info-sheets/dred-scott-0 ; www.
battlefields.org/learn/articles/trigger-events-civil-war ; www.britannica.com/
summary/Dred-Scott-Decision-Causes-and-Effects).

*www.battlefields.org/learn/articles/10-facts-black-patriots- american-revolution* ;
*www.army.mil/article/97705/black_soldiers_in_the_revolutionary_war* [During the Revolutionary War (April 19,
1775 – September 3, 1783) …. "It's the winter of 1777-1778. Under Gen. George Washington, the Continental Army is
waiting out the winter at Valley Forge, Penn. Just one year earlier, they had led lighting-fast, surprise attacks against
the British at Trenton and Princeton, N.J. But now, many of the Soldiers are without shoes and blankets. They're
starving…. In the rest of the Army, [Black People - some **already free**, some enslaved-] who served with each
company were fully integrated: They fought, drilled, marched, ate and slept alongside their [W]hite counterparts.
There was never enough food or clothes or even pay for anyone, but they shared these hardships equally….After
watching a review of the Continental Army in New York, one French officer estimated that as much as a quarter of the
Army was [B]lack…. They served in almost every unit, in every battle from Concord to Fort Ticonderoga to Trenton to
Yorktown."I've heard one analysis say that the Army during the Revolutionary War was the most integrated that the
Army would be until the Korean War,") ;

*https://lithub.com/how-the-one-drop-rule-became -a-tool-of-white-supremacy/* [Although not initially the law, or
custom, of the Land "Black [People, and survivors of the Black American Holocaust now] are defined by the one-drop
rule. No other racial or ethnic group is defined in this way, nor does any other nation rely upon this formula; the

*one-drop rule is definitively Black and characteristically American. It should make sense then that the origins of the rule are directly linked to the history of Black people in the United States, and as such, our discussion of the one-drop rule begins during the period of colonial enslavement.  Within the context of colonial enslavement, Blackness—prototypical and phenotypical African features such as dark skin, a broad nose, tightly coiled hair—were the undeniable markers of inferiority (<u>after America's one drop rule's racial hierarchical hegemony</u>). These features served to immediately communicate one's position within the social power structure, and in the context of enslavement, whether one was free or enslaved.  If you were [W]hite, you were free; if you were Black, you were enslaved.")*

74.     Taking persons, or human beings, without consent is kidnapping, or enslavement.  See e.g. (written decades before the 13th, 14th or 15th Amendments' Constitutional enshrinement, 16 years before *Dred Scott* [most racist opinion which helped directly spark the Civil War within 5 years of its ruling,] argued by 1 of 2 non-slave holding ex-Presidents of the United States, *at the time*, already recognizing the personhood, and fundamental rights of Black men and persons, including the right to self defense, even against White Corporate for-profit enslavers per *La Amistad*) The United States v. the Amistad, 40 U.S. 518 (1841) (...This case is not only one of deep interest in itself, …. but it involves considerations deeply affecting our national character in the eyes of the whole civilized world, as well as questions of power on the part of the government of the United States… It presents, for the first time, the question whether that government, which was established for the promotion of JUSTICE, which was founded on the great principles of the Revolution, as proclaimed in the Declaration of Independence, can, consistently with the genius of our institutions, become a party to proceedings for the enslavement of human beings .... The Constitution as it now stands will be searched in vain for an expression recognising human beings as merchandise or legitimate subjects of commerce…. in reference to the power "to regulate commerce" conferred on Congress by the Constitution, that "persons are not the subjects of

commerce."....The United States, as a nation, is to be regarded as a free state. And all men being presumptively free)  Stripping rights, and reducing a human being to anything less than a full human being, with all the rights and privileges is enslavement, and barbarity.  Sex without consent is rape.   Taking Property of another without consent is theft or conversion.

75.     Under current law these are principles commonly understood, as is the legal, and moral, liability of a world renowned university, in the business of teaching law, knowing (*by its own written admissions* www.georgetown.edu/privacy-policy/; publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/) that it is illegal to take, and make public, an up close photo without *prior written authorization agreement,* and consent, of an admitted student:

> "Privacy Policy: In keeping with *state and federal legislation*, the University safeguards the privacy of patients, **students**, employees, University business, and other matters by protecting electronic records classified as confidential information. *Unauthorized accessing and/or disclosure of confidential information by University* employees is *prohibited* and may result in legal penalties. This policy applies to records maintained in any type of electronic record: computer, voice, or video. It also applies to records created via the Georgetown University website." - www.georgetown.edu/privacy-policy/

> "As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is: (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution **(*i.e. explaining commonly understood reasonable expectation of privacy*)**. …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

76.     Georgetown itself has made this argument in Federal Court (*with D.C. Circuit's status and prestige among American federal courts generally considered second only to the U.S. Supreme Court*):

> "Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University.…..**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

Moreover, it is even more illegal to then use that photo to publicize, market, and make public for pecuniary gain Mr. Austin's privacy, and publicity, rights protected image, likeness or close up photo. Yet, Georgetown did so knowingly, and willfully (despite their own Federal Court arguments against being *forced* to disclose this type of data, or information), and even after admissions of their initial wrongdoing and still proceed, to date, in a pattern of 1. Equal Protection, 2. 42 USC 1981 3. Deceit 4. Negligence and 5. Bad Faith to Mr. Austin's detriment (without repentance, nor correction to Mr. Austin's ongoing legal injuries proximately caused by Georgetown);

79.     Because Mr. Austin is early on in his career, and still in development, the improper use violations as well as surrounding violations triggering Constitutional, statutory, and common law liability (*particularly by an institution charged with the public and private trust, receiving federal funds, to educate our populace on the law)* is particularly disturbing and violative of Mr. Austin's rights.  Georgetown's conduct toward Mr. Austin more resembles *Rev. Thomas Mulledy as they totally ignored Mr. Austin's Constitutional rights, enshrined after the Civil War, to eradicate all of the badges and vestiges of the enslavement period because he is a Black man.*  See e.g. slaveryarchive.georgetown.edu/ (...Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.)

## AFFIDAVIT, SIGNATURE, AND PARAGRAPH COUNT.

All above legal references tied directly to plead facts from paragraphs-sections 41-81 (as part of paragraphs 1-188), are true, and as I, George Jarvis Austin personally experienced, witnessed, and observed. Further all legal references which highlight, Mr. Austin's, plead facts as relevant, decisive, persuasive and compelling have been affirmed by the United States Supreme Court, Ninth Circuit, Northern District and California Courts.

**George Jarvis Austin**
**s/ George Jarvis Austin, Self Represented, 11/22/23**